# Exhibit 3

# SHAREHOLDER AGREEMENT
## *of*
# NILES LANKFORD GROUP, INC., PENSION SYSTEMS, INC.
## *&*
# RETIREMENT SYSTEMS OF CALIFORNIA, INC.

This Shareholder Agreement ("Agreement") is entered into this ___*1st*___ day of __*October*____, 2014 by and among Brad R. Lankford ("Lankford"), Clinton C. Reese ("Reese"), Keith Pyle ("Pyle"), Trent Newcomb ("Newcomb") and Michael Gossard ("Gossard") (collectively, Lankford, Reese, Pyle, Newcomb and Gossard are referred to as the "Shareholders"), and Niles Lankford Group, Inc., Pension Systems, Inc., and Retirement Systems of California, Inc. (hereinafter referred to individually as the "Corporation" and collectively as the "Corporations").

## WITNESSETH

WHEREAS, the Shareholders are the only Shareholders of the Corporations, and their respective shares of stock, constitute all the issued and outstanding shares of stock of the Corporations;

WHEREAS, the Shareholders own the same percentage of stock in each of the Corporations, the share allocation of which are set forth as to each Corporation in the attached "Exhibit A";

WHEREAS, the Shareholders have entered into various contracts and agreements regarding or related to the management and governance of the Corporations, including prior Shareholder Agreements under prior allocations of share ownership among the Corporations;

WHEREAS, the Shareholders believe that it is in the best interests of the Corporations and the Shareholders to (i) restrict the transfer of each of the Corporation's shares as set forth herein, (ii) provide for sales of each of the Corporation's shares under certain circumstances, and (iii) memorialize certain understandings among them into this Shareholder Agreement so as to provide for the future disposition of the ownership of stock in the Corporations and the Corporations' assets, and to further provide for certain terms of governance of the Corporations, and in doing so, the Shareholders hereby revoke, rescind, void, cancel and otherwise terminate any and all Shareholder and related Agreements previously executed between and by the Shareholders and the Corporations, except as to the application and enforcement of a prior Shareholder Agreement which remains binding on any non-signatory to this Agreement.

WHEREAS, the Shareholders understand that each is expected to devote the majority of his time and efforts to promote the interests of the Corporations;

NOW, THEREFORE, in consideration of the mutual agreements, terms and conditions set forth herein, the Shareholders and the Corporations (collectively, the "Parties") agree as follows:

1. <u>Transfers of Shares:</u> In the event that any Shareholder shall desire or be compelled by any means to sell, assign, pledge, or otherwise transfer or encumber in any manner or by any means whatsoever (any of the foregoing, a "Transfer") any interest in any or all shares of a Corporation presently owned or hereinafter acquired, such Transfer may only occur (if at all) pursuant to the terms and conditions stated in this section:

    1.1   <u>Definitions:</u> For purposes of this Agreement, the following definitions shall apply:

    1.1.1 "Anticipated Revenue" shall mean the estimated annual revenue from the acquisition, agreement, or sale made or entered into by a given Corporation to the extent such estimated revenue has not been fully realized or has otherwise not been included in the Gross Receipts of the Corporations.

    1.1.2 "Available Cash" means the aggregate amount of cash on hand or in the bank, money market or similar accounts of a Corporation from time to time derived from the business and operations of that Corporation: (i) after payment or provision for payment of all reasonable costs and expenses of operations, (ii) after payment or provision for payment of debt service, including, without limitation, debt service under any Corporate Debt, and (iii) after taking into account any amount required or appropriate to maintain a reasonable amount of reserves as determined by the Board of Directors in its discretion.

    1.1.3 "Corporate Debt" shall mean the sum of (i) the outstanding principal balance of any debt for borrowed money represented by notes or other negotiable instruments and owed by a Corporation to any person or entity (except for any debt relating to leases for equipment or software), (ii) any outstanding lines of credit or other lending held by the Corporation to the extent utilized, and (iii) the present value of any series of payments owed by the Corporation for the acquisition of business. The present value of any series of payments is to be calculated assuming a six percent (6%) discount factor. Further, in the event that any payments are conditioned on collections, then a five percent (5%) annual attrition rate on expected collections shall be utilized, except as set forth in the acquisition agreement or other related documents.

    1.1.4 "Excess Working Capital" shall mean the sum of (i) the total cash on hand in a Corporation as of the Valuation Date, (ii) any other liquid assets held by that Corporation as of the Valuation Date, including in the event of the death of a Shareholder, any and all life insurance proceeds owed to that Corporation pursuant to Section 4 of this Agreement (even though such proceeds were not recorded as of the Valuation Date), less (iii) Two Hundred Thousand Dollars ($200,000).

1.1.5 "Firm Value" shall mean the sum of the Gross Receipts of a Corporation, plus Excess Working Capital, minus Corporate Debt (all as determined as of the Valuation Date).

1.1.6 "Firm Value Per Share" shall mean the result obtained by multiplying the Firm Value by 1.10, then dividing that product by the aggregate number of shares issued and outstanding as of the applicable Valuation Date.

1.1.7 "Gross Receipts of the Corporation" shall mean the sum of (i) the total revenue collected by a Corporation over the twelve (12) month period immediately preceding the Valuation Date, plus all of the Anticipated Revenue.

1.1.8 "Permanently Disabled" shall mean when a Shareholder is, by reason of illness, injury or disability, permanently unable to carry out his or her normal duties in the conduct of a Corporation's business, and:

1.1.8.1 such Shareholder receives disability benefits under the terms of any disability income policy held on him or her; or

1.1.8.2 such Shareholder is unable to effectively carry out his or normal duties during any twelve (12) months during any eighteen (18) consecutive month period, as attested to by a physician appointed by the Corporation; or

1.1.8.3 such Shareholder receives Social Security benefits as a result of his or her disability.

1.1.9 "Valuation Date" shall mean:

1.1.9.1 For those shares purchased as a result of the death of a Shareholder, the last calendar day of the month immediately preceding the date of death of the deceased Shareholder; or

1.1.9.2 For all other shares subject to sale to either the Corporation or the remaining Shareholders of that Corporation pursuant to the terms of this Agreement, the last calendar day of the month immediately preceding the date such shares first become subject to purchase.

1.2    Voluntary Sale of Shares. Subject to Section 6.10 herein, in the event that any Shareholder of a given Corporation (the "Selling Shareholder") desires to sell, trade, or otherwise transfer any or all of his or her shares of any of the Corporations (the "Offered Shares"), either to the other Shareholder(s) of that Corporation (collectively referred to as the "Remaining Shareholders"), to that Corporation, or to any third party, the Selling Shareholder shall:

3

1.2.1   Submit to the Corporation in writing an offer to sell the Offered Shares (or any portion thereof), pursuant to the following terms and conditions (the "Corporation's Offer"):

1.2.1.1 The Corporation's Offer must be delivered by personal delivery or by certified mail, return receipt requested with sufficient postage prepaid, to the President or Chief Executive Officer of the Corporation. The Corporation's Offer shall be reasonably detailed and shall contain the identity of the proposed transferee and the terms and conditions upon which the Selling Shareholder desires to sell the Offered Shares.

1.2.1.2 The Corporation's Offer shall provide the Corporation with the right to purchase any or all of the Offered Shares on the same terms and conditions as the Selling Shareholder desires to sell the Offered Shares to the proposed transferee.

1.2.1.3 For a period of thirty (30) days after the receipt of such notice, the Corporation shall have the right to notify the Selling Shareholder of its acceptance or rejection of the Corporation's Offer.

1.2.2   In the event that the Corporation does not elect to purchase any or all of the Offered Shares within the thirty (30) day period described above, submit to the Remaining Shareholders (including a Remaining Shareholder who is the proposed transferee of the Offered Shares) in writing an offer to sell the Offered Shares, or such portion thereof remaining after the Corporation makes its election with respect to the Corporation's Offer, pursuant to the following terms and conditions (the "Shareholder Offer"):

1.2.2.1 The Shareholder Offer must be delivered by personal delivery or by certified mail, return receipt requested with sufficient postage prepaid, to the last known address of each Remaining Shareholder on file with the Corporation. The Shareholder Offer will contain the same detailed information regarding the proposed sale as the Corporation's Offer.

1.2.2.2 The Shareholder Offer shall provide the Remaining Shareholders with the right to purchase the Offered Shares on the same terms and conditions as the Selling Shareholder desires to sell the Offered Shares to the proposed transferee.

1.2.2.3 For a period of thirty (30) days after the receipt of such notice, the Remaining Shareholders shall have the right to notify the Selling Shareholder and the Corporation of their acceptance or rejection of their right to purchase any Offered Shares remaining after the Corporation's Offer on a pro rata basis according to their respective ownership of shares of the Corporation without regard to the Offered Shares; provided that each such Remaining Shareholder who elects to purchase Offered Shares shall have the right to over-subscribe for their respective pro rata portion of any Shares not so purchased by the Corporation or the other Remaining Shareholders.

4

1.2.3   In the event that, after the completion of the Corporation's Offer and the Shareholder Offer, the Corporation and the Remaining Shareholders have not timely elected to purchase all of the Offered Shares, the Selling Shareholder may sell any remaining Offered Shares to the proposed transferee identified in the Corporation's Offer and the Shareholder Offer (but only to such proposed transferee and only in strict accordance with the terms and conditions set forth in the Corporation's Offer and the Shareholder Offer). If the Selling Shareholder fails to consummate such sale within ninety (90) days of delivery of the Corporation's Offer, the Offered Shares shall again become subject to the provisions of this Section 1.2, and may not be sold or otherwise Transferred without the Selling Shareholder again complying with the terms of this Agreement.

1.2.4   Notwithstanding anything to the contrary in this Section 1.2, (a) the purchase price to be paid by the Corporation and/or the Remaining Shareholders for each Offered Share shall in no event exceed the Firm Value Per Share, and (b) the Corporation and/or the Remaining Shareholders may elect (in its/their sole discretion) to pay the purchase price for any Offered Shares according to the following terms and conditions:

1.2.4.1 Twenty percent (20%) of the total purchase price shall be paid at the closing by wire transfer or certified check of immediately available funds; and

1.2.4.2 The remainder of the purchase price shall be paid pursuant to a promissory note in seventy-two (72) equal monthly installments of principal, together with interest at a rate of six percent (6%) per annum, except where the Offered Shares represent more than fifty percent (50%) of total issued and outstanding shares of the Corporation, in which case the remainder shall be paid in one hundred twenty (120) equal monthly installments of principal, together with interest at a rate of six percent (6%) per annum.

1.2.5 In the event that all of the Offered Shares are purchased by the Corporation or the Remaining Shareholders, the Corporation shall use commercially reasonable efforts to obtain the release of the Selling Shareholder from any and all obligations he or she has with respect to any Corporate Debt (including, without limitation, any obligation on the then authorized line of credit available to the Corporation).

1.2.6   In all cases, the closing of the sale of any Offered Shares to the Corporation and/or the Remaining Shareholder(s) shall take place at the office of the Corporation within ninety (90) days of delivery of the Corporation's Offer. At closing, the Selling Shareholder or his legal representative shall deposit the Offered Shares with the Corporation. The shares shall be duly endorsed in blank for transfer and shall be accompanied by all other documents necessary for an effective transfer. Payment of the purchase price shall be made simultaneously

with the delivery of the shares. However, if the purchase price includes an unsecured promissory note pursuant to Section 1.2.4.2 above, (1) the purchasing Shareholder(s) shall provide a personal guaranty of delivery of the purchase price and (2) a number of shares sufficient to secure the promissory note shall be held in escrow until the note has been fully amortized and cancelled. The number of shares held in escrow shall be adjusted according to the current outstanding balance on the note on each anniversary of the sale or at any other time by agreement of the parties thereto; provided, however, that if the Selling Shareholder owned more than fifty percent (50%) of the issued and outstanding shares of the Corporation immediately prior to the sale of the Offered Shares, the number of shares held in escrow shall not be reduced below 50% for any such Corporation until the note is fully amortized and cancelled.

1.2.7   If the Selling Shareholder owns more than fifty percent (50%) of the issued and outstanding shares of the Corporation immediately prior to the sale of the Offered Shares, the Selling Shareholder shall be entitled to hold the position of Chairman of the Board of Directors for that Corporation until such time as the total shares either owned directly or held in escrow (pursuant to Section 1.2.6 above) are less than fifty percent (50%), and such Selling Shareholder has been removed as personal guarantor from any debt of that Corporation.

1.3    Disability or Termination of Employment of Shareholder: If a Shareholder becomes Permanently Disabled or terminates employment with the Corporation, then such Permanently Disabled Shareholder shall be deemed to have offered to sell his or her shares to the Corporation and the Remaining Shareholders as if the Permanently Disabled or terminated Shareholder had commenced a voluntary sale pursuant to Section 1.2, except that the following terms and conditions will apply and supersede those comparable in Section 1.2:

1.3.1   The sale price for each share offered for sale under this Section 1.3 shall be in all cases the Firm Value Per Share.

1.3.2   In the event that, after completion of the Corporation's Offer and the Shareholder Offer, the Corporation and the Remaining Shareholders  fail to elect to purchase all of the Offered Shares subject to purchase pursuant to this Section 1.3, the Permanently Disabled or terminated Shareholder shall have the right to require the Corporation to purchase all (but not less than all) of such remaining Offered Shares.

1.3.3   In all cases, payment for purchases of shares under this Section 1.3 shall be paid as follows (unless the Parties otherwise agree in writing):

1.3.3.1 Twenty percent (20%) of the total purchase price shall be paid at the closing by wire transfer or certified check of immediately available funds; and

1.3.3.2 The remainder of the purchase price shall be paid pursuant

to an unsecured promissory note in seventy-two (72) equal monthly installments of principal, together with interest at a rate of six percent (6%) per annum, except where the Offered Shares represent more than fifty percent (50%) of total issued and outstanding shares of the Corporation, in which case the remainder shall be paid in one hundred twenty (120) equal monthly installments of principal, together with interest at a rate of six percent (6%) per annum.

1.4    Force Out: At any time, the Shareholder(s) of a given Corporation owning more than fifty percent (50%) of the then issued and outstanding shares of that Corporation (the "Controlling Shareholders") may vote to force any Shareholder of that Corporation (a "Forced Out Shareholder") to involuntarily sell all (but not less than all) of his or her shares to that Corporation (each, a "Forced Sale"), pursuant to the terms and conditions below:

1.4.1 The Corporation shall provide written notice to the Forced Out Shareholder notifying him or her of the exercise of the Forced Sale provisions in this Section 1.4, and the Forced Out Shareholder shall be deemed to have offered to sell his or her shares to the Corporation and the Remaining Shareholders as if the Forced Out Shareholder had commenced a voluntary sale pursuant to Section 1.2, except that the following terms and conditions will apply and supersede those comparable in Section 1.2:

1.4.2 The sale price for each share offered for sale under this Section 1.4 shall be in all cases the Firm Value Per Share.

1.4.3 In all cases, payment for purchases of shares under this Section 1.4 shall be paid as follows (unless the Parties otherwise agree in writing):

1.4.3.1 Forty percent (40%) of the total purchase price shall be paid at the closing by wire transfer or certified check of immediately available funds; and

1.4.3.2 The remainder of the purchase price shall be paid pursuant to an unsecured promissory note in forty-eight (48) equal monthly installments of principal, together with interest at a rate of six percent (6%) per annum.

1.4.4 In the event that of a Forced Sale, the Corporation shall use commercially reasonable efforts to obtain the release of the Selling Shareholder from any and all obligations he or she has with respect to any Corporate Debt (including, without limitation, any obligation on the then authorized line of credit available to the Corporation).

1.5    <u>Death of Shareholder</u>: Upon the death of any Shareholder of a Corporation, that Corporation shall be required to purchase, and the estate of the deceased Shareholder shall be required to sell, the entire interest of such deceased Shareholder in the Corporation, and the entire interest of the estate of the deceased Shareholder in the Corporation, according to the terms set forth herein:

1.5.1   The personal representative of the deceased Shareholder's estate shall give notice of the deceased Shareholder's death to the Corporation. Within ninety (90) days of such notice, the Corporation shall purchase, and the estate shall sell, all (but not less than all) of the shares of the Corporation formerly held by the deceased Shareholder.

1.5.2   The purchase price paid to the estate of the deceased Shareholder for his or her shares shall be the product of the Firm Value Per Share, multiplied by the number of shares to be purchased.

1.5.3   In all cases, payment for purchases of shares under this Section 1.5 shall be paid as follows:

1.5.3.1 Subject to Section 4, an upfront payment of cash at the closing (by wire transfer or certified check of immediately available funds) equal to the greater of (i) the balance of any life insurance proceeds received by the Corporation pursuant to Section 4 of this Agreement less the Shareholder's Obligations (defined in Section 4.1 herein) and key-man benefit to the Corporation, if any, described under Section 4.1, or (ii) twenty percent (20%) of the total purchase price due pursuant to Section 1.5.2.

1.5.3.2 The remainder of the total purchase price shall be paid pursuant to an unsecured promissory note in seventy-two (72) equal monthly installments of principal, together with interest at a rate of six percent (6%) per annum, except where the Offered Shares represent more than fifty percent (50%) of total issued and outstanding shares of the Corporation, in which case the remainder shall be paid in one hundred twenty (120) equal monthly installments of principal, together with interest at a rate of six percent (6%) per annum.

1.6   Divorce: If the shares of any Shareholder of a Corporation become subject to Transfer as a result of a decree of divorce or separation agreement in connection with a divorce, the Corporation and the Remaining Shareholders shall have the option to purchase such shares (and the applicable Shareholder shall be deemed to have offered to sell his or her shares to the Corporation and the Remaining Shareholders) as if such Shareholder had commenced a voluntary sale pursuant to Section 1.2, except that the following terms and conditions will apply and supersede those comparable in Section 1.2:

1.6.1   The sale price for each share offered for sale under this Section 1.6 shall be in all cases the Firm Value Per Share.

1.6.2 In all cases, payment for purchases of shares under this Section 1.6 shall be paid as follows (unless the Parties otherwise agree in writing):

1.6.2.1 Twenty percent (20%) of the total purchase price shall

8

be paid at the closing by wire transfer or certified check of immediately available funds; and

> 1.6.2.2 The remainder of the purchase price shall be paid pursuant to an unsecured promissory note in seventy-two (72) equal monthly installments of principal, together with interest at a rate of six percent (6%) per annum, except where the Offered Shares represent more than fifty percent (50%) of total issued and outstanding shares of the Corporation, in which case the remainder shall be paid in one hundred twenty (120) equal monthly installments of principal, together with interest at a rate of six percent (6%) per annum.

1.7    Drag Along/Tag Along Rights:  Subject to Section 1.2 above, if the Controlling Shareholders wish to sell all or such portion of their shares in a Corporation which, in the aggregate constitute a majority of the outstanding shares of that Corporation as of such date, to a third party pursuant to a bona fide offer, the Controlling Shareholders may require each remaining Shareholder to sell to such third party all of such remaining Shareholder's then outstanding shares (or such applicable portion thereof if the Controlling Shareholders sell less than all of their shares) at the same price per share and on the same terms and conditions as the Controlling Shareholders. The Controlling Shareholders shall notify the remaining Shareholders in writing not less than sixty (60) days prior to the proposed consummation of the sale of their intention to exercise the drag-along rights under this Section 1.7.1. The Controlling Shareholders will have ninety days from the date of delivery of notice of the sale to consummate the sale. If the sale to the third party is not completed during such period, then the remaining Shareholders will be released from their obligations to sell their shares to the third party purchaser.

> 1.7.1    Subject to Section 1.2 above, in the event that the Controlling Shareholders wish to sell all or such portion of such Shareholders' shares which, in the aggregate constitute a majority of the outstanding shares of the Corporation as of such date, to a third party, the remaining Shareholders will have the right to sell to the third party the shares then held by such Shareholders in an amount equal to his or her pro rata share of the number of shares proposed to be sold to the third party by the Controlling Shareholders at the same price per share and on the same terms and conditions as the Controlling Shareholders. Remaining Shareholders shall notify the Controlling Shareholders in writing not less than thirty (30) days prior to the proposed consummation of the sale of their intention to exercise the tag-along rights under this Section 1.7.1. However, if the shares were offered for voluntary sale pursuant to Section 1.2, any Shareholder who did not exercise his or her right to purchase such shares will be deemed to have waived the tag-along rights described in this Section 1.7.1.

> 1.7.2    If a Forced Out Shareholder, or a Selling Shareholder who owned more than fifty percent (50%) of the issued and outstanding shares of the Corporation immediately prior to a sale of shares, has sold his or her shares (i) within the two-year period immediately preceding a third party sale described in 1.7 above or (ii) has not received the full purchase price from sale of his or her shares prior to a third party sale described in 1.7 above, the Controlling Shareholders shall notify such Forced

Out or Selling Shareholder of the sale or anticipated sale. If the third party sale price per share exceeds the price paid to the Forced Out or Selling Shareholder, such Forced Out or Selling Shareholder shall have the right to have to receive an adjustment to the price per share he or she received such that the total amount received by the Forced Out or Selling Shareholder, including the proceeds he or she received from the previous sale and this adjustment, total the amount that such Forced Out or Selling Shareholder would have received based on the number of shares sold in the previous sale and the price per share in the third party sale pursuant to Section 1.7.

1.7.3   If any remaining Shareholder participates in a sale pursuant to this Section 1.7 (either pursuant to Section 1.7.1 or 1.7.2), such remaining Shareholder shall enter into and become a party to any purchase agreement or other applicable related agreement entered into by the Controlling Shareholders in order to effect such sale and shall be bound by the same obligations under such agreement as the Controlling Shareholders; provided that, if the Controlling Shareholders force such remaining Shareholder to participate in a sale pursuant to Section 1.7.2, (a) no remaining Shareholder shall be obligated to undertake any indemnity that is joint in nature, nor in excess of his or her proportionate ownership of the shares of the Corporation nor in excess of proceeds received in respect of his or her shares in connection with such sale, (b) the consideration to be paid to each Shareholder shall be paid in cash (unless such holder shall elect otherwise), and (c) no remaining Shareholder shall be required to make any representation, warranty or covenant other than a representation as to such Shareholder's title to his or her shares to be transferred and his or her power and authority to transfer such shares.

1.8     Exceptions: Notwithstanding anything to the contrary in this Agreement:

1.8.1   No Transfer shall adversely affect any Corporation's election to be treated as an S corporation under the Internal Revenue Code of 1986, as amended (as reasonably determined by the Board of Directors, after consultation with counsel);

1.8.2   The proposed recipient of any Transfer of shares of Corporation (other than a transferee who is a Shareholder prior to such Transfer) (a) shall deliver to the Corporation any and all documents and agreements requested by the Corporation so that such transferee becomes bound by all obligations, and entitled to all rights and privileges of a Shareholder, under this Agreement, and (b) shall not be any person who directly or indirectly competes with the Corporation's business (as reasonably determined by the Board of Directors, after consultation with counsel);

1.8.3   Any Transfer of shares of the Corporation shall be made (a) pursuant to an effective registration under the Securities Act of 1933, as amended, and any applicable state securities laws, or (b) pursuant to an exemption from such registration;

1.8.4   Lankford shall have the unrestricted right (at any time) to Transfer any or all of the shares of a Corporation he owns (up to twenty-five percent (25%) of the total issued and outstanding shares of the Corporation) to any other

Shareholder of that Corporation or any third party who is an individual and not an entity. Lankford shall have sole discretion as to the transferees of such shares, the number of shares being transferred to each transferee so long as the total does not exceed twenty-five percent (25%) of all issued and outstanding shares. For purposes of clarity, all such shares of the Corporation so Transferred by Lankford shall not be subject to the restrictions set forth in Section 1.2, but upon consummation of any such Transfer, such Shares shall again become subject to the restrictions set forth in Section 1.2;

1.8.5  Lankford shall have the unrestricted right to solicit and sell all or any portion of his Shares or all or substantially all of the assets of a Corporation to any third parties. Lankford shall submit any and all received offers to purchase a Corporation to the other Shareholders of that Corporation, who are hereby granted the unrestricted right of first refusal to match or exceed any such offers and thereby buy out Lankford's entire interest in the Corporation. Such sale shall be governed by the terms and conditions set forth in Section 1.2.4 above (except for the limitation in 1.2.4(a)). Any proceeds from any sale under this Section to third parties shall be distributed to the Shareholders pursuant to their respective ownership interests.

1.8.6  If a Shareholder or group of Shareholders desire to collectively sell, trade, or otherwise transfer shares that, in the aggregate, constitute a majority of the then issued and outstanding shares of a Corporation, the terms of Section 1.2 shall not apply; and

1.8.7  Any attempted Transfer of shares of a Corporation, other than in accordance with this Agreement shall be null and void and the Corporation shall refuse to recognize any such Transfer and shall not reflect on its records any change in record ownership of shares pursuant to any such Transfer.

2.    Governance:    The Shareholders agree that, notwithstanding anything to the contrary in a Corporation's articles, bylaws, resolutions or other agreements, the following shall apply with respect to the control and governance of the Corporations, except where otherwise required by law:

2.1    The Board of Directors of each Corporation shall consist of Lankford (for so long as he owns shares), and two members of the Board appointed by the Shareholders by majority vote.

2.2    Pursuant to the sale rights set forth in this Agreement, Lankford shall have the right in his sole discretion, and on a continuing basis, to appoint and fill up to eight
(8) additional voting members to the Board of Directors of each Corporation.

2.3    The Board shall consist of no fewer than three (3) or more than eleven
(11) voting members.

2.4    The President and Chairman of the Board of Directors shall be

11

Lankford for so long as he owns shares of that Corporation.

2.5    The Treasurer of each Corporation shall be appointed by the Board of Directors, until he or she is removed or replaced in accordance with that Corporation's bylaws.

2.6    The Chief Financial Officer of each Corporation shall be appointed by the Board of Directors, until he or she is removed or replaced in accordance with that Corporation's bylaws.

2.7    Except as otherwise set forth in this Agreement, the approval of any and all Major Transactions, as defined herein, must be authorized by (a) a majority of the Board of Directors of that Corporation, (b) a majority vote of the Shareholders thereof on a per capita basis, and (c) with the agreement of Lankford (to the extent he remains a Shareholder.) Major Transactions, as used herein shall consist of:

2.7.1  The decision to make any and all corporate distributions, except those specifically provided for in this Agreement or otherwise required by law or the terms of this Agreement; it will be the standing policy to distribute all profits annually, unless by Board vote or consenting resolution, action is taken to do otherwise.

2.7.2 The amendment or waiver of this Agreement, as more fully set forth in Section 6.10;

2.7.3 Any and all issuances of shares or other equity interests in the Corporations, as more fully set forth in Section 6.4 below;

2.7.4 Any and all lending to any person or entity by a Corporation;

2.7.5 Any and all transactions entered into on or after the date of this Agreement between a Corporation and an individual or joint business interest which include an officer, employee, owner, or director of the Corporation or to any entity owned or controlled, in whole or in part, by any officer, employee, owner, or director of the Corporations;

2.7.6 Implementation of any share option plan or benefit plan not in existence at the time of execution of this Agreement; and/or

2 .7. 7 Any amendment or modification to the articles of incorporation or bylaws of the Corporation.

2.8    Lankford must authorize (a) any and all acquisitions, either by stock purchase or asset purchase, of any corporations, partnerships, or other entities by the Corporation, and (b) any and all reorganizations of the Corporations.

12

Notwithstanding anything to the contrary set forth herein, a Corporation shall not hire, contract with, or otherwise engage (a) any family member of a Shareholder or any member of the Board of Directors or (b) any entity which is significantly owned or controlled by a family member of any member of the Board of Directors.

3.   <u>Distributions</u>: Subject to the discretion of the Board of Directors, each Corporation shall distribute Available Cash each month to the Shareholders based on their pro rata ownership of that Corporation (the "Monthly Distributions"). In the event that the Board of Directors determines that Available Cash is not adequate to pay Monthly Distributions in full, the Monthly Distributions shall be reduced by the lowest percentage required in order to maintain adequate reserves, as determined by the Board of Directors.

4.   <u>Life Insurance on Shareholders</u>: A Corporation may secure and pay for life insurance policies on the lives of the Shareholders and in the amount or amounts as it deems appropriate from time to time. If a Shareholder shall die while a Corporation holds an insurance policy on his or her life pursuant to this Section, the proceeds from such policy shall be divided in accordance with Section 4.1.

4.1   Upon the death of a Shareholder so insured, so much of the life insurance proceeds that are necessary to fully pay and satisfy to the Corporation's lending institution(s) in compliance with said Shareholder's security obligation with respect to said Corporation's debt ("Shareholder's Obligations") shall be paid and/or acquired to said lending institutions. The balance of any insurance proceeds remaining after payment of the Shareholder's Obligations shall be used by said Corporation as a "key man" benefit up to a maximum of Two Hundred Fifty Thousand Dollars ($250,000). Thereafter the estate of the deceased Shareholder shall receive at the closing of the purchase of the deceased Shareholder's interest as down payment towards the purchase of the deceased Shareholder's interest under Section 1.5, the greater of the remaining insurance proceeds or twenty-percent (20%) of the total purchase price of the deceased Shareholder's interest by wire transfer or certified check of immediately available funds.

4.2   In the event the Corporation is unable to obtain life insurance for any Shareholder on terms and conditions the Board of Directors believes to be commercially reasonable and/or in the best interests of the Corporations based on its financial condition and projected financial performance, then upon the death of such Shareholder, twenty percent (20%) of the total purchase price shall be paid to the estate of the deceased Shareholder at the closing of the purchase of the deceased Shareholder's interest described under Section 1.5 by wire transfer or certified check of immediately available funds.

4.3   The remainder of the total purchase price due and owing any estate of a deceased Shareholder after the down payment described in Sections 4.1 or 4.3, or the case may be, shall be paid pursuant to an unsecured promissory note in seventy-two (72) equal monthly installments of principal, together with interest at a rate of six

13

percent (6%) per annum, except where the Offered Shares represent more than fifty percent (50%) of total issued and outstanding shares of the Corporation, in which case the remainder shall be paid in one hundred twenty (120) equal monthly installments of principal, together with interest at a rate of six percent (6%) per annum.

4.4    In the event that a Corporation or the other Shareholders of that Corporation purchase all of a Shareholder's shares during his or her lifetime pursuant to this Agreement, any life insurance policies on the life of such Shareholder shall be, for a period of sixty (60) days after the closing of such purchase, subject to such Shareholder having the right to purchase all such contracts of insurance on his or her life. Further, upon termination of this Agreement, for any reason, each Shareholder shall have the right to purchase, within sixty (60) days thereafter, all contracts of insurance on his or her life pertaining to this Agreement.

4.5    The Corporation shall only modify or impair the rights or values under a life insurance policy with the mutual written consent of the Shareholder to which such policy relates.

5.    <u>Non-Competition:</u>

5.1    Each Shareholder shall not, at all times during the Restricted Period (as defined below), directly or indirectly (including as a principal, agent, employee, owner, investor, lender or trustee) engage, anywhere within the Restricted Territory (as defined below), in a Competing Business (as defined below); provided that (a) Lankford shall have the right to acquire, or form a new business, that may be a Competing Business, so long as Lankford gives each Shareholder of record (at the time of such acquisition or formation) ownership of such entity or business ("Affiliated Entity") in the same proportion as such Shareholder owns shares in the Corporations, and (b) any Shareholder may purchase or otherwise acquire up to (but not more than) five percent (5%) of any class of the securities of any entity (but may not otherwise participate in the activities of such entity) if such securities are listed on any national or regional securities exchange or have been registered under Section 12(g) of the Securities Exchange Act of 1934, as amended. A Shareholder's ownership of an Affiliated Entity shall not be deemed a breach of this Agreement. The Shareholders agree (in connection with the acquisition or formation of an Affiliated Entity) to execute and deliver an agreement substantially similar to this Agreement with respect to each Affiliated Entity in which they own an equity interest.

For purposes of this Section 5, (1) a "Competing Business" is a business that engages to any extent in the design, installation, recordkeeping and/or annual administration or actuarial certification of qualified retirement plan as defined under IRS Sections 401(a), 403(b) or 457 plans, (2) "Restricted Period" means, with respect to each Shareholder, the period of time such Shareholder owns his or her shares of a Corporation, plus (in the case of a Selling Shareholder who has sold or transferred all of his or her shares of the Corporations for any reason other than for a Force-Out pursuant to Section 1.4 (whether to a permitted third party, the Corporations or the Remaining Shareholders)),

14

two (2) years from the date of such sale, and (3) "Restricted Territory" means (A) for each Shareholder, anywhere in the United States for the period of time such Shareholder owns his or her shares of the Corporation, and (B) for each Selling Shareholder who has sold or transferred all of his or her shares of a Corporation for any reason other than for a Force-Out pursuant to Section 1.4 (whether to a permitted third party, the Corporation or the Remaining Shareholders), anywhere within One Hundred Fifty (150) miles of any Corporation's office at the time of such sale. For purposes of clarity only (and without limitation), the two (2) year period described above in the definition of Restricted Period shall not apply to a Forced Out Shareholder.

5.2     Each Shareholder agrees that, at all times during his or her ownership of shares of a Corporation and for a period of two (2) years following the termination of his or her share ownership, such Shareholder shall not (a) directly or indirectly induce any clients/customers of the Corporation to patronize any Competing Business; (b) directly or indirectly request or advise any client/customer of the Corporation to withdraw, curtail or cancel such client's/customer's business with the Corporation; (c) directly or indirectly disclose to any other person, partnership or corporation the names or addresses of any of the clients/customers of the Corporation; (d) directly or indirectly solicit the employment of any Corporation's employee(s) or employ a former Corporation's employee (other than the Shareholder himself or herself); (e) become employed by, become an independent contractor for, or otherwise enter into a business relationship with a client of the Corporation; or (f) in the case of a Selling Shareholder who has sold all of his or her shares of the Corporation pursuant to Section 1.2 (whether to a permitted third party, the Corporation or the Remaining Shareholders), become employed by, become an independent contractor for, or otherwise enter into a business relationship with a Competing Business within the Restricted Territory.

5.3     Because of the difficulty of measuring the economic loss suffered as a result of a violation of this Section, it is agreed that liquidated (that is, established) damage equal to two hundred percent (200%) of the previous twelve (12) months' fees/sales to that client/customer shall be paid by the breaching Shareholder to the non-breaching Corporation or remaining Shareholders for each violation of the Agreement made under this Section. In the event that customer/client has not, at the time of breach, accumulated twelve (12) months' fees/sales, damages shall be appraised at the anticipated annual fees for the customer/client. Each separate twelve (12) month period in which such representation, counseling, providing a service to or sales to or solicitation of the same occurs, shall be considered a separate violation for each separate client/customer. Said sum shall thus be payable for each separate client/customer year of violations; the maximum on a per client/customer basis shall not exceed two hundred percent (200%) of billings/sales for the twelve (12) months prior to the first violation. For breach of Section 5 by soliciting employment of a Corporation's employee, the liquidated damages shall be two (2) times the annual total compensation, including any commissions, of the employee for the previous twelve (12) month period.

5.4     It is agreed that in the event of a breach or threatened breach by a Shareholder of this covenant, a Corporation or the other Shareholders of that Corporation

shall be entitled to an injunction to enforce these provisions and such other remedies as may be allowed by law, including the recovery of money damages. Each Shareholder represents and acknowledges that his experience and capabilities are such that he or she can obtain employment elsewhere and that the enforcement of these provisions by way of injunction will not prevent him from earning a livelihood. The Shareholders and the Corporations expressly declare that the foregoing time limitations are reasonable and are properly required for the adequate protection of the Corporations and, in the event that either the territorial or time limitation, or both, is declared to be unreasonable by a court of competent jurisdiction, the Corporations and Shareholders agree to the reduction of either the territorial or time limitation, or both, to such an area or period of time as the court shall deem reasonable, and that the invalidity of any portion of these provisions shall not effect or hinder the enforceability of the remaining provisions hereof.

5.5     The provisions set forth in this Section 5 (including without limitation the obligations of the Shareholders hereunder) shall survive any termination of this Agreement for any or no reason for the time periods specified herein.

6.     <u>Miscellaneous Provisions:</u>

6.1     <u>Effective Date:</u> This Agreement shall be deemed effective as of the date first set forth above.

6.2     <u>Rights and Remedies for Breach:</u>

6.2.1 Specific Performance: It is the intent and purpose of this Agreement that the shares of the Corporations not be purchased or sold in the open market. For that reason, among others, the Parties will be irreparably damaged in the event that this Agreement is not specifically enforced. Should any dispute arise concerning the sale or disposition of the shares of the Corporations, then an injunction may be sought and obtained restraining any sale or disposition pending the determination of such controversy.

6.2.2 <u>Other:</u> The non-breaching Parties shall have all of their rights and remedies available at law and in equity, and in addition to such remedies, the non-breaching Party or Parties shall be entitled to collect reasonable attorney fees incurred as a result of said breach, and all court costs incurred in pursuing any of said remedies.

6.3     <u>Easement of Share Certificates:</u> Upon the execution of this Agreement or within a reasonable time thereafter, the Shareholders shall cause their share certificates to be endorsed as follows:

"The sale, assignment, transfer, pledge or other disposition of the shares of capital stock represented by this certificate are subject to a certain Shareholder Agreement dated _____, a copy of which Agreement is on file in the office of the Corporations."

The Parties hereto agree that all shares of the Corporations issued or transferred to or by them hereafter shall be subject to this Agreement and shall have the above notice endorsed thereon the notice hereinbefore set forth.

6.4 <u>Preemptive Rights:</u> The issuance of new shares of the Corporations shall be deemed a Major Transaction and subject to Section 2.7. The Shareholders shall have pre-emptive rights to subscribe for and purchase any their respective pro rata share of any additional issuances of shares of the Corporations of any class or any shares of the Corporations purchased or acquired by the Corporations and not cancelled but held as treasury shares.

6.5 <u>Termination:</u> Except as otherwise set forth herein, the obligations of any Shareholder under this Agreement shall terminate with respect to any shares Transferred by such holder in compliance with this Agreement, upon any such Transfer to a Corporation, or in the case of any other such Transfer upon the transferee's acknowledgment that such transferee is bound by the terms hereof. This Agreement shall terminate upon the occurrence of any of the following events:

6.5.1 The purchase of the shares of the Corporations held by a Shareholder (or the estate of such Shareholder), so as to leave only one Shareholder a party to this Agreement; however, such purchase will still subject the Parties hereto or the estate of a deceased Shareholder to fulfilling the obligations of this Agreement;

6.5.2 The dissolution of the Corporations; or

6.5.3 Mutual written agreement of all of the Parties.

6.6 <u>Disclosures of Information:</u> Each Shareholder recognizes and acknowledges that he or she will have access to certain confidential information of the Corporations and of entities affiliated with the Corporations and its Shareholders and that such information constitutes valuable, special and unique property of the Corporations, such other entities, and the Shareholders. For purposes of this Section, "confidential information" shall include, but not be limited to, customer names and customer lists, prices charged to customers and pricing and billing formulae and policies, all office manuals and forms, and any other documents, items and things used by the Corporations or the Shareholders which are designated as or known to be confidential or proprietary, regardless of whether such item is specifically marked or labeled as such. Except in connection with their duties as employees of a Corporation (as applicable), the Shareholders will not, during or after the period of time in which such Shareholder holds shares of a Corporation, disclose any of such confidential information to any person, firm, corporation, association or other entity for any reason or purpose whatsoever, except to authorized representatives of a Corporation, its affiliated entities or the Shareholders. In the event of a breach or threatened breach by a Shareholder of the provisions of this paragraph, the Corporation and/or its non-breaching Shareholders shall be entitled to an injunction restraining the breaching Shareholder from disclosing, in whole or in part, such confidential information. Nothing herein

17

shall be construed as prohibiting a Corporation and/or the non-breaching Shareholders from pursuing any other remedies available to it for such breach or threatened breach, including the recovery of damages from the breaching Shareholder.

   6.7   Shareholder Compensation: All compensation paid to the Shareholders for services provided as employees of a Corporation, shall be subject to approval of the President of that Corporation.

   6.7.1   Lankford's Compensation: As President of the Corporations, Lankford's compensation shall be an aggregate sum of Two Hundred Forty Thousand Dollars and 00/100 ($240,000.00), annually paid by the Corporations on a basis established by the Board of Directors of each Corporation, payable as is customary for other employees of the Corporations.

The provisions of this Section 6.7.1 may only be modified by a unanimous vote of the Board of Directors.

   6.7.2   Lankford's Board Chair Director's Fee: Lankford shall be entitled to an aggregate fee of Twelve Thousand Dollars and 00/100 ($12,000.00) annually, paid quarterly on a basis established by the Board of Directors of each Corporation, as compensation for serving as Chairman of the Board of Directors for each Corporation.

   6.8 Notices: All notices, requests and other communications to any Party hereunder shall be in writing (including telex, telecopy or similar writing) and shall be given to such Party at its address or to the addresses set forth on Exhibit A hereto, or such other address as such Party may hereafter specify for such purpose by notice to the other Parties. Except as otherwise provided herein, each such notice, request or other communication to a Party shall be deemed delivered or given (a) if given by mail, three (3) business days after being deposited in the mails, certified, postage prepaid, addressed to such Party, or (b) if given by any other means, when delivered to such Party at its address specified as provided in this Section 6.8.

   6.9   Financial Statements and Other Information: The Corporations will furnish to the Shareholders copies of all annual or other financial statements the Corporations regularly provides to the banks or other lenders extending credit to any of the Corporations and such other information as may reasonably be required by any Shareholder.

   6.10 Amendments and Waivers: Any provision of this Agreement may be amended or waived only if such amendment or waiver is in writing and is approved as a Major Transaction; provided that without a Shareholder's written consent, no such amendment or waiver shall adversely affect such Shareholder's rights hereunder in a discriminatory manner inconsistent with its adverse effects on rights of other Shareholders hereunder. The Board of Directors, may from time to time, amend and/or revise Exhibit "A" to reflect any change in the ownership of shares (as applicable); provided, however, that any such changes have been duly authorized and approved by any and all necessary action on the part of the Board of Directors

18

and/or the Shareholders in accordance with this Agreement.

6.11 <u>Successors and Assigns:</u> The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective personal representatives, heirs, successors and assigns (including any person who acquires any shares and agrees to be bound by the provisions hereof).

6.12 <u>Governing Law:</u> This Agreement shall be construed in accordance with and governed by the laws of the State of Indiana (without giving effect to any principles of conflicts of law that would result in the application of another state's laws). Any controversy, claim or dispute arising out of or relating to this Agreement or the breach, termination, enforceability or validity of this Agreement, shall be brought in the courts of the State of Indiana, Marshall County, or, if it has or can acquire jurisdiction, any United States District Court sitting in St. Joseph, Indiana, and each of the Parties irrevocably submits to the exclusive jurisdiction of each such court in any such matter, waives any objection it may now or hereafter have to venue or to convenience of forum, agrees that all claims in respect of the matter shall be heard and determined only in any such court and agrees not to bring any such matter arising out of or relating to this Agreement in any other court. The Parties agree that either of them may file a copy of this paragraph with any court as written evidence of the knowing, voluntary and bargained agreement between the Parties irrevocably to waive any objections to venue or to convenience of forum. Process in any matter referred to in this paragraph may be served on any Party anywhere in the world.

6.13 <u>Counterparts: Effectiveness:</u> This Agreement may be signed in any number of counterparts, each of which shall be an original, but all of which shall constitute one and the same instrument. Facsimile transmission of a counterpart hereto shall be deemed an original hereof.

6.14 <u>Captions:</u> The captions in this Agreement are included for convenience of reference only, do not constitute a part hereof and shall be disregarded in the interpretation or construction hereof.

6.15 <u>Entire Agreement:</u> Subject to the terms of the Corporations' articles of incorporation and by-laws, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all previous agreements, whether written or oral, relating to the same subject matters, (including, without limitation, the Niles Lankford Group, Inc. Buy-Sell Agreement dated March 22, 1989, the Niles Lankford Group, Inc. Amended and Restated Buy-Sell Agreement dated November 15, 2005, the Niles Lankford Group, Inc. Buy-Sell Agreement dated September 23, 2009 and the Highland Management Group, Inc. Buy-Sell Agreement dated September 23, 2009), except as to the application and enforcement of a prior Shareholder Agreement which remains binding on any non-signatory to this Agreement. All such previous agreements, if any, among the Parties (or any of them) are hereby terminated and shall have no further force or effect.

19

**[Signature Page(s) Follow]**

IN WITNESS WHEREOF, the Parties have executed this Agreement on the date first above written.

**"Corporations"**

NILES LANKFORD GROUP, INC.                    PENSION SYSTEMS, INC.

By:_____            By:_____
      Brad R. Lankford, President                         Brad R. Lankford, President

PENSION SYSTEMS, INC.

By:_____
      Brad R. Lankford, President

RETIREMENT SYSTEMS OF CALIFORNIA

By:_____
      Brad R. Lankford, President

**"Shareholders"**

_____
Brad R. Lankford

_____
Clinton C. Reese

_____
Keith Pyle

_____
Trent Newcomb

_____
Michael Gossard

# EXHIBIT A

## NILES LANKFORD GROUP, INC.

| Shareholder & Address | Number of Shares |
|---|---|
| Brad R. Lankford<br>1689 W. Highland Court<br>Warsaw, IN 46580 | 435 |
| Clinton C. Reese<br>3615 Bellecrest Avenue<br>Cincinnati., OH 45208 | 16.25 |
| Keith Pyle<br>1400 N. Park Avenue<br>Indianapolis, IN 46202 | 16.25 |
| Trent Newcomb<br>16870 Easy Street<br>Plymouth, IN 46563 | 16.25 |
| Michael Gossard<br>4326 Vista Walk Lane<br>Powell, OH 43065 | 16.25 |

## RETIREMENT SYSTEMS OF CALIFORNIA, INC.

| Shareholder & Address | Number of Shares |
|---|---|
| Brad R. Lankford<br>1689 W. Highland Court<br>Warsaw, IN  46580 | 8,700 |
| Clinton C. Reese<br>3615 Bellecrest Avenue<br>Cincinnati., OH  45208 | 325 |
| Keith Pyle<br>1400 N. Park Avenue<br>Indianapolis, IN  46202 | 325 |
| Trent Newcomb<br>16870 Easy Street<br>Plymouth, IN  46563 | 325 |
| Michael Gossard<br>4326 Vista Walk Lane<br>Powell, OH  43065 | 325 |

## PENSION SYSTEMS, INC.

| Shareholder & Address | Number of Shares |
| --- | --- |
| Brad R. Lankford<br>1689 W. Highland Court<br>Warsaw, IN  46580 | 435 |
| Clinton C. Reese<br>3615 Bellecrest Avenue<br>Cincinnati., OH  45208 | 16.25 |
| Keith Pyle<br>1400 N. Park Avenue<br>Indianapolis, IN  46202 | 16.25 |
| Trent Newcomb<br>16870 Easy Street<br>Plymouth, IN  46563 | 16.25 |
| Michael Gossard<br>4326 Vista Walk Lane<br>Powell, OH  43065 | 16.25 |

IN WITNESS WHEREOF, the Parties have executed this Agreement on the date first above written.

**"Corporations"**

NILES LANKFORD GROUP, INC.

By:

Brad R. Lankford, President

PENSION SYSTEMS, INC.

By:

Brad R. Lankford, President

RETIREMENT SYSTEMS OF CALIFORNIA

By:

Brad R. Lankford, President

**"Shareholders"**

Brad R. Lankford

Clinton C. Reese

Keith Pyle

Trent Newcomb

Michael Gossard