UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| LATITUDE COMPANY, INC., <br><br> Plaintiff, <br><br> v. <br><br> CLINTON C. REESE, <br><br> Defendant/Third Party Plaintiff. <br><br> v. <br><br> BRAD LANKFORD; NORTH AMERICAN KTRADE ALLIANCE, LLC; RETIREMENT SYSTEMS OF AMERICA, LLC; HIGHLAND MANAGEMENT GROUP, INC.; and EIRA, LLC, <br><br> Third Party Defendants. | Case No. 3:21-CV-728 JD |

**OPINION AND ORDER**

Plaintiff Latitude Service Company Inc. sued Defendant Clinton Reese seeking a declaratory judgment binding Mr. Reese to the terms of a 2014 shareholder agreement and a separate agreement Mr. Reese allegedly entered into to sell his shares in Latitude and other Latitude-affiliated entities in the spring of 2021. (DE 24.) Mr. Reese filed several iterations of a combined answer, counterclaim, and third-party complaint. Mr. Reese's filings denied that he was subject to the prior agreements and brought claims of his own seeking relief from Latitude and other third-party defendants for their attempts to, among other things, limit his business opportunities and withhold money from him that he alleges he was owed as a shareholder of Latitude and the other entities. (DE 26; DE 34.) Mr. Reese also moved for a preliminary injunction asking the Court to order Latitude and related parties to prepare for Mr. Reese a new

Schedule K-1 tax form; to refrain from representing to others that Mr. Reece has sold or transferred any interest in Latitude or any of its affiliates, or that he is subject to a non-compete agreement with Latitude; and stop interfering with Mr. Reese's new contractual and employment relationships.[1] For the reasons stated below, the Court will deny the motion.

A.      **Factual Background**

Mr. Reese was a Latitude employee and was involved in various agreements with other individuals, including Third-Party Defendant Brad Lankford, that led to the combination of several prior business entities into what is today Latitude, a third-party retirement plan administration firm. The 2014 shareholder agreement Latitude is trying to enforce on Mr. Reese is one such agreement. Mr. Reese claims to hold just under 5% of the shares in Latitude as well as a similar percentage of shares in other related companies, several of which Mr. Reese has now named as third-party defendants. Mr. Reese left his employment with Latitude in the late spring of 2021 and the parties dispute how his leaving affected his shares in Latitude and the affiliated companies. Mr. Reese maintains that he is still a shareholder, but Latitude has brought a claim for breach of contract in which it alleges that Mr. Reese previously agreed to sell his shares back as part of a separation agreement the parties reached near the time Mr. Reese stopped working with Latitude. (DE 24 ¶¶ 43–47.) Latitude's complaint also seeks a declaration that Mr. Reese remains bound by several noncompete agreements. Latitude alleges that Mr. Reese is bound by

---

[1] Although Mr. Reese titles his motion as both a motion for a temporary restraining order and a motion for preliminary injunction, the Court interprets the motion as a motion for preliminary injunction, given that Mr. Reese's requests more closely resemble a request for a preliminary injunction. *See Decker v. Lammer*, 2022 WL 125429, at *2 (7th Cir. 2022) (citing a request for relief that would last an unspecified amount of time and a non-ex parte proceeding as suggesting a preliminary injunction instead of a temporary restraining order). This treatment is immaterial to the Court's consideration of the issues, however, because "[t]he standards for granting a temporary restraining order and preliminary injunction are the same." *USA-Halal Chamber of Comm., Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 3d 427, 433 n.5 (N.D. Ill. 2019).

restrictive covenants from a shareholder agreement from 2014 and from a buyout agreement in 2021.

Mr. Reese filed a motion for preliminary injunction against Plaintiff Latitude Service Company; Third-Party Defendant Brad Lankford; and Third-Party Defendants Highland Management Group Inc., Retirement Systems of America LLC, North American KTRADE Alliance, and EIRA LLC. (For simplicity sake and because Plaintiff Latitude Service Company is the driving force behind this lawsuit, the Court will refer to all of Mr. Reese's opponents in this case as "Latitude.")  Mr. Reese is asking the Court to order Latitude to prepare for Mr. Reese a new Schedule K-1 tax form; to refrain from representing to others that Mr. Reece has sold or transferred any interest in Latitude, or that he is subject to a non-compete agreement with Latitude; and stop interfering with Mr. Reese's new contractual and employment relationships.[2]

In support of the motion, Mr. Reese states that he's not bound by the 2014 shareholder agreement to which he was a signatory and which contained restrictive covenants. He submits that the shareholder agreement became void under its own terms as a result of the merger of the controlling companies into Latitude. He also insists that the shareholder agreement was in effect only for a period when he owned his shares under the agreement plus two years from the date of the disposal of such shares, and that he had disposed of such shares during the merger. He thus argues that Latitude has no right to represent to others that he remains bound by the restrictive covenant of the 2014 shareholder agreement.

Mr. Reese also maintains that he has retained his ownership interest in Latitude even upon his employment termination with Latitude. Mr. Reese owns or owned—depending on

---

[2] In his motion, Mr. Reese also has a request concerning any shareholder meetings, but he had filed a separate motion addressing this issue, which the Court denied (DE 51).

which party is to be believed—just under 5% of the outstanding shares in Latitude Service Company and Highland Management Group.[3] Mr. Reese states that, in April 2021, Mr. Lankford informed him that his employment with Latitude would be terminated effective May 31, 2021. Mr. Reese and Mr. Lankford then began negotiating a separation agreement, including a possible purchase of Mr. Reese's ownership interest. Toward the end of the negotiations, Latitude's in-house counsel, Keith Pyle, sent Mr. Reese an attachment of "the final term sheet based on [their] conversation this morning." (DE 54-1, Pyle Email.) At the top of the proposed terms of Mr. Reese's Termination and Buyout, the document has a disclaimer:

> The terms included herein are **not** intended to constitute a binding or enforceable agreement, express or implied, for the transaction(s) that are the subject hereof or be a binding agreement upon any of the parties hereto. Included below are the basic proposed terms regarding employment separation and ownership buyout of Reese from all ownership in Latitude and its related companies (the "Company") and interests. If the terms laid out are agreeable, we will draft the appropriate agreement(s) and related documents to effect the transaction.

(DE 38-2.) In his email, Mr. Kyle asked Mr. Reese to "[p]lease confirm you are in agreement and we'll draw up an agreement." (*Id.*) Half an hour later, Mr. Reese responded with "I agree with the terms listed in the attached PDF." (*Id.*, Reese's Email.) A week later, Mr. Pyle emailed Mr. Reese and his attorney "drafts of the separation agreement and transfer powers." (DE 38-2, Pyle email; DE 38-2, Redemption and Separation Agreement.) He asked them to "[p]lease let us know your thoughts at your earliest convenience." (*Id.*) Mr. Reese rejected the proposal. Mr. Reese was terminated on May 31, 2021.

In January 2022, Mr. Reese began working as a consultant for SMS Retirement in Cincinnati, Ohio. Mr. Reese claims that he has not solicited or initiated any contact or

---

[3] Mr. Reese is also a shareholder and president of CCR TPA Inc. which was also an owner of shares in Latitude-related companies, but for the purposes of this order, CCR TPA can be ignored.

4

communication with any of Latitude's clients or customers since his termination of the employment. (DE 38-1, Reese Aff. ¶ 20.) On August 1, 2022, Latitude's counsel contacted Mr. Reese's counsel, stating that if Mr. Reese did not agree to sell his ownership interest in Latitude, SMS Retirement would be informed that Mr. Reese was violating his restrictive covenants in the shareholder agreement. That same day, Mr. Reese relayed this conversation to Mark Strakowski, the president of SMS, who consulted with his counsel and terminated the business relationship with Mr. Reese out of concern for litigation. Five days later, on August 6, Latitude's counsel wrote a letter to SMS stating among other things that Mr. Reese's employment with SMS violated the shareholder agreement:

> Mr. Reese still maintains his ownership interest in Latitude and its affiliates. As an owner of Latitude, Mr. Reese entered into a Shareholder Agreement that included certain restrictive covenants, including covenants not to compete, divert business away from Latitude, or solicit Latitude's customers. Mr. Reese's employment with SMS as a Retirement Plan Consultant, in addition to his solicitation efforts on behalf of SMS, plainly violate his Shareholder Agreement.

(DE 38-2, Macchia Letter at 94.)

On September 13, 2022, Latitude issued Schedule K-1 tax forms to Mr. Reese representing that he is not an owner and that he sold or transferred his ownership interest in 2021. Mr. Reese, who maintains that he's still a shareholder of Latitude, believes that Latitude's filing is preventing him from filing his tax returns and wants Latitude to correct its Schedule K-1 Forms.

**B.    Standard of Review**

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal

5

Practice and Procedure § 2948, pp. 129–130 (2d ed.1995)). It is "never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "As a threshold matter, a party seeking a preliminary injunction must demonstrate (1) some likelihood of succeeding on the merits, and (2) that it has 'no adequate remedy at law' and will suffer 'irreparable harm' if preliminary relief is denied." *Cassell v. Snyders*, 990 F.3d 539, 544–45 (7th Cir. 2021) (quotation marks and citations omitted). "If the moving party cannot establish either of these prerequisites, a court's inquiry is over and the injunction must be denied." *Abbott Lab'ys v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992); *see also Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008) (same). "If these threshold factors are met, the court proceeds to 'a balancing phase,' where it "must then consider: (3) the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied; and (4) the public interest, meaning the consequences of granting or denying the injunction to non-parties." *Cassell*, 990 F.3d at 544–45 (7th Cir. 2021) (quotation marks and citations omitted).

"Harm is irreparable if legal remedies are inadequate to cure it. Inadequate does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021) (quotation marks and brackets omitted); *see also Orr v. Shicker*, 953 F.3d 490, 502 (7th Cir. 2020) (irreparable harm is "harm that 'cannot be repaired' and for which money compensation is inadequate"). Moreover, "an injunction will not be issued when the plaintiff has an adequate remedy at law, which he does if he can assert the ground on which he seeks an injunction as a defense to the very proceeding that the injunction would put a stop to." *W.C.M. Window Co. v. Bernardi*, 730 F.2d 486, 490 (7th Cir. 1984).

### C.   Discussion

The Court will address Mr. Reese's arguments for preliminary injunction. In his briefs, Mr. Reese focuses the majority of his attention on the merits prong of the test for granting a preliminary injunction. However, as to each request, Mr. Reese has failed to make a clear showing that he would suffer irreparable harm or that no adequate remedy at law exists if the injunction is not granted. As such, the Court need not explore whether Mr. Reese's claims have a reasonable likelihood of success on the merits. After all, even if the Court were to assume that Mr. Reese is likely to prevail in this case, given that a preliminary injunction is an extraordinary remedy, he must still show that he will suffer irreparable harm absent an injunction. *See Abbott Lab'ys v. Mead Johnson & Co.*, 971 F.2d at 11 ("If the moving party cannot establish either of [the threshold prerequisites], a court's inquiry is over and the injunction must be denied." ) A motion for a preliminary injunction is not meant to short-circuit the legal process that leads to trial but to provide an equitable remedy when no legal remedies are available. In addition, without the threshold showing, there's no need for the Court to analyze the balance of harms between the parties and the effect of granting or denying a preliminary injunction on the public interest.

**(1)   *Mr. Reese's Ownership Interest in Latitude***

Mr. Reese claims that Latitude's filing of the Schedule K-1 Forms for Mr. Reese have placed him "in an untenable situation, as [he] cannot file his tax returns without violating federal law." (DE 38 at 18.) He therefore asks that the Court enjoin Latitude from making further false statements to the IRS and to file accurate Schedule K-1 Forms. He insists that "[i]n the absence

of immediate injunctive relief, ordering Latitude and its Affiliates to prepare accurate, truthful Schedule K-1 Forms, [he] has no possible remedy at law to redress the unlawful situation created by Latitude." (*Id.* at 19.) In making his request for this preliminary injunction, Mr. Reese has not established that he will suffer irreparable harm or that no adequate remedy at law exists.

While Mr. Reese insists that, as shareholder of Latitude, he cannot file his own tax return unless Latitude first amends its filing, he has not explained how his position is grounded in law. In fact, he merely speculates that his hands are tied. He quotes 26 U.S.C. § 7206(1) as placing a legal obligation on Latitude to file true and correct returns, but he does not explain how the law prohibits him from filing a return that is contrary to Latitude's position, so long as he believes that his return is "true and correct as to every material matter," § 7206(1). Moreover, although Latitude points out that 26 U.S.C. §§ 6222(c) and 6037(c) provide a remedy for situations where a partner or a shareholder takes an inconsistent position with the company's tax return,[4] Mr. Reese provides no argument to the contrary in his reply brief, further undermining his assertions. The Court is unconvinced that Mr. Reese cannot file his tax return unless Latitude changes its filing. In other words, Mr. Reese has not shown that, absent a preliminary injunction regarding Latitude's filing of Schedule K-1 Forms, he will suffer irreparable harm or that there is no adequate remedy at law.

Further, to the extent that Mr. Reese complains that Latitude is falsely representing that he has sold or transferred any of his ownership interests in Latitude, here, too, he has not shown irreparable harm or that no adequate remedy at law exists. One of the alleged harms is that Mr.

---

[4] In addition, Internal Revenue Service instructions state that Form 8082 may be used to "notify the IRS of any inconsistency between your tax treatment of an item and the way the pass-through entity treated and reported the same item on its return." Instructions for Form 8082, https://www.irs.gov/pub/irs-pdf/i8082.pdf (last viewed November 16, 2022).

Reese is not getting paid the "management fees" which are due pursuant to his ownership of the shares. Yet, if he prevails at trial, any past due amounts will be readily ascertainable and damages can be awarded without much difficulty. Also, while Mr. Reese alludes to the fact that, as a shareholder he has some input in steering the companies (presumably to increase his financial returns), he has not shown that he has an actual ability to change the course, especially in light of the fact that Mr. Lankford is the president and overwhelming majority owner (80.25%) of Latitude and most of the Latitude affiliates. (*See* DE 38-1, Reese Aff. ¶ 12.)

**(2)** *Restrictive Covenants*

Mr. Reese also asks the Court to enjoin Latitude from making any oral or written statements to any third party asserting that he is subject to any restrictive covenants with Latitude, arising either from the 2014 shareholder agreement or any alleged agreement as part of his termination of employment at Latitude, or otherwise meddle into his future business prospects. He submits that he "has *already* suffered serious, immediate, and irreparable harm" due to SMS Retirement terminating its consulting agreement with him as a result of Latitude's insistence that he is subject to restrictive covenants (DE 38 at 18.) According to Mr. Reese, this has resulted "in incalculable damages to his important business relationship and the loss of future income and business opportunities, which will be difficult to ascertain and calculate. And SMS Retirement is merely one of the prospective business, contract, and employment opportunities at risk, due to Latitude's threat of litigation against Reese's potential business partners, employer's and customers." (*Id.*) Mr. Reese submitted an affidavit from the president of SMS Retirement who states that SMS was considering a full-time employment opportunity for Mr. Reese when it learned of Latitude's legal claims. (DE 55 at 9 n.17.) He thus assumes that he would still be

working at SMS and potentially getting paid salary, bonus, employment benefits, and equity opportunities. (*Id*. at 9.)

Although the Court can appreciate the difficulties Mr. Reese is facing as a result of Latitude's actions, be they justified or not, Mr. Reese has not clearly shown that the harms he is suffering are irreparable, that is, they cannot be repaired and for which money compensation is inadequate. *See Orr v. Shicker*, 953 F.3d at 502 (7th Cir. 2020) (describing irreparable harm). Mr. Reese cites no case law where the Court granted a preliminary injunction in similar circumstances. Instead, he relies on two cases neither of which helps him much. The first case is from this district, *Lincoln Chem. Corp. v. DuBois Chemicals, Inc.*, No. 3:12-CV-303 RLM-CAN, 2012 WL 6553098, at *1 (N.D. Ind. Dec. 13, 2012), where a chemical company sought to enjoin a former employee from misappropriating trade secrets. *Id*. at *6. The Court granted the injunction to the company and enjoined the former employee from violating the restrictive covenants. *Id*. at *10. In discussing the nature of possible harm to the chemical company, the court observed that, by the time a trial would be conducted, only speculative damages would be available and no expert could determine what business the chemical company would have gotten but lost because of the employee's breach of his covenant not to compete. "Nor could damages be reasonably calculated for any misuse of trade secrets between now and the end of the litigation process." *Id*. at *7.

But that's different from the case at hand. Mr. Reese's potential damages—by his own admission—are mostly monetary: salary, bonuses, employment benefits, business opportunities, and equity opportunities. Mr. Reese was in the process of negotiating his terms of possible employment at SMS, so presumably there's information available about his potential compensation. And evidence already exists as to how much SMS had paid Mr. Reese for his

consulting services. In addition, expert testimony may be employed to determine the scope of the damages. What's more, the restrictive covenants are in effect for at most two years, so the period within which the damages would accrue is limited. And while Mr. Reese suggests that he may be missing business opportunities, he has not offered anything concrete for the Court to consider. A speculation that the damages are unascertainable doesn't suffice in establishing irreparable harm.

The second case upon which Mr. Reese is relying, *Turnell v. Centimark Corp.*, 796 F.3d 656, 666–67 (7th Cir. 2015), is similarly unavailing. To be fair, to say that Mr. Reece is "relying" on this case is a stretch: he does not explain how it is similar to his predicament, how it supports his motion, or how it undermines Latitude's opposition to his motion for preliminary injunction. Instead, he merely cites *Turnell* to suggest that his situation involves the "canonical form of irreparable harm." (DE 55 at 9.) While this quote may suggest an orthodox standard, Mr. Reese needs to show that the facts of his case fit that standard. This he has failed to do.

Worse yet, *Turnell*'s reference to "canonical form of irreparable harm" is in relation to the employer's injury flowing from a former employee's violation of a restrictive covenant, not the other way around:

> The injuries that flow from the violation of a non-compete are difficult to prove and quantify. *See CertainTeed*, 481 F.3d at 529 ("[I]t may be very difficult to show that the ex-employee has used confidential information."); *John G. Bryant Co. v. Sling Testing and Repair, Inc.*, 471 Pa. 1, 369 A.2d 1164, 1167 (1977) (characterizing such damage as "incalculable"). That is what makes restrictive covenants prime candidates for injunctive relief. [Defendant's] breaches, if left unchecked, might cause little harm to [Plaintiff], or they might cause great harm. But either way, the magnitude and even the existence of the injury will be difficult to discern. Injunctive relief is therefore the best, and probably the only, adequate remedy.

*Turnell*, 796 F.3d at 666–67. In fact, *Turnell* found just the opposite about the employee's potential harm: "[Former employee's] harm seems largely reparable. If he prevails in a trial on the merits, it should be possible to quantify his losses and compensate him fully with damages."

11

*Id*. at 666. In summary, *Turnell* provides no help to Mr. Reece's argument that his harms arising out of Latitude's insistence that he is bound by the restrictive covenants are irreparable. Without such a showing, the Court cannot enter a preliminary injunction on Mr. Reese's behalf.

As a final matter, the Court notes that there are some circumstances in which the availability of monetary damages would not preclude preliminary relief. For example, if having to wait for a final judgment to receive the damages would force the plaintiff into insolvency in the interim, a preliminary injunction can be justified. *See, e.g.*, E.g., *Girl Scouts*, 549 F.3d at 1089 (finding irreparable harm where the defendant's conduct, if not enjoined, "would impose severe financial stress on [the plaintiff] that could ultimately force [the plaintiff] into insolvency"); *see also Hamlyn v. Rock Island Cnty. Metro. Mass Transit Dist.*, 960 F. Supp. 160, 162 (C.D. Ill. 1997). But Mr. Reese has not argued that, but for the Court entering a preliminary injunction, he will be financially ruined. He does allude that perhaps Latitude is now worth a fraction of what it used to be worth, yet he does not suggest that it would not be able to pay a judgment in his favor. In other words, Mr. Reese has not provided an alternative basis for establishing irreparable harm.

### C.     Conclusion

For the foregoing reasons, the Court DENIES Mr. Reese's Motion for Temporary Restraining Order (DE 37).

SO ORDERED.

ENTERED: November 18, 2022

                                           /s/ JON E. DEGUILIO
                                           Chief Judge
                                           United States District Court