UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

LATITUDE SERVICE COMPANY, INC., et al.,

      Plaintiffs,

      v.                          Case No. 3:21-CV-728-CCB-SJF

CLINTON C. REESE,

      Defendant.

**OPINION AND ORDER**

On August 26, 2021, Plaintiff Latitude Service Company, Inc. ("LSC") filed its complaint in state court raising a declaratory judgment claim against Defendant Clinton Reese. After removal to this Court, the complaint was amended twice adding Highland Management Group, Inc. ("Highland") as a plaintiff along with six more claims. Mr. Reese asserted counterclaims against Plaintiffs and alleged third-party claims against Retirement Systems of America, LLC ("RSAm"), North American KTRADE Alliance, LLC ("KTRADE"), eIRA, LLC, and Brad Lankford. The parties' claims reflect disputes including, but not limited to, Mr. Reese's status as a shareholder of LSC and Latitude-affiliated entities; the validity and enforceability of certain agreements; the reasonableness of restrictive covenants in those agreements; and alleged breaches of fiduciary duties related to shareholder rights and obligations. Before the Court now are fully briefed cross motions for partial summary judgment on these claims.

The Court has subject matter jurisdiction based on a diversity of citizenship under 28 U.S.C. § 1332(a) and may exercise supplemental jurisdiction under 28 U.S.C. § 1367 over the claims against the non-diverse third-party defendants. [DE 51 at 4–9]. Based on the applicable law, facts, and arguments, the cross-motions for summary judgment will both be granted in part and denied in part.

## I.    RELEVANT BACKGROUND

The following facts are largely not in dispute.  Any disputed facts are either not material or will be addressed in the substantive analysis below.

Mr. Reese has been employed in the retirement industry for about 30 years, including 15 years with Niles Lankford Group, Inc. ("NLG") before working for Third-Party Defendant RSAm. In 2009, while employed by NLG, Mr. Reese acquired a minority ownership interest in NLG and Highland, both closely held and related companies.  He and the other shareholders entered into shareholder agreements for both companies—the 2009 NLG Shareholder Agreement [DE 148-8] and the 2009 Highland Shareholder Agreement [DE 148-9].  In 2009, the shareholders of both companies included majority shareholder Brad Lankford, the co-founder of NLG, and minority shareholders Mr. Reese, Keith Pyle, Mike Gossard, and Trent Newcomb.  In 2014, the shareholders executed a new shareholder agreement ("2014 NLG Shareholder Agreement") for NLG and the related companies Pension Systems, Inc. ("PSI"), and Retirement Systems of California ("RSC"). [DE 140-3].  The 2009 and 2014 NLG Shareholder Agreements included restrictive covenants and terms governing shareholder distributions that were largely the same.

In April 2017, the shareholders created a new company, Imperium Holdings, Inc. ("Imperium").  [DE 148 at 4–5; DE 148-11].  The shareholders then decided to consolidate NLG, PSI, PSC, and a fourth company, Retirement Systems of Arizona ("RSAz") (collectively the "Affiliate TPAs") under a single owner—Imperium—with ownership of Imperium distributed among the same shareholders in the same percentages of ownership in the Affiliate TPAs.  [*Id.*]. Four documents were at the heart of this corporate restructuring:  (1) 2017 Joint Written Consent [DE 140-4 at 1–8]; (2) Contribution Agreement [DE 140-4 at 9–12]; Plan of Reorganization [DE 140-4 at 13–16]; and Shareholder Agreement for Imperium Holdings ("2017 Imperium Shareholder Agreement") [DE 140-6].  The parties disagree as to whether the 2017 Imperium Shareholder

2

Agreement was executed.  Yet the shareholders, including Mr. Reese, later executed a 2018 Joint Written Consent through which Imperium's name was changed to Latitude Service Company, Inc. ("LSC"), the Affiliate TPAs were merged into LSC, and LSC was made the sole member of each TPA.  [DE 140-12; DE 148 at 11].  No one challenges the 2018 Joint Written Consent.

After the 2018 merger, Mr. Reese continued working as National Sales Director for RSAm. In 2020 and into 2021, LSC considered additional merger and acquisition strategies with a long-term eye toward sale of the companies.  [DE 148-47; DE 158 at 23–25; *see also* DE 148-44 through 148-46 and DE 148-48 through 148-49].  In April 2021, Mr. Lankford, LSC's president and its majority shareholder, informed Mr. Reese that his employment at RSAm and ownership in all the LSC-related companies would be terminated.  [DE 140-1 at 7; DE 148 at 11–12].  After that, Mr. Pyle, LSC's internal counsel and Mr. Reese's co-shareholder, began negotiations with Mr. Reese about the terms of his separation and buyout.  [DE 140-1 at 7; DE 148 at 12].  Negotiations continued through April and May mostly through telephone calls and email.  [*Id.*].  In an email dated May 19, 2021, Mr. Reese indicated he agreed with certain terms that he and Mr. Pyle had negotiated.  [DE 140-13; DE 140-17].  Mr. Pyle then provided a written draft of the agreement to Mr. Reese and his attorney on May 27, 2021.  [DE 148-57; DE 158 at 32].  The parties disagree as to whether a valid and enforceable separation agreement resulted from these communications between Mr. Pyle and Mr. Reese.  The parties also disagree as to what, if any, shareholder rights and obligations applied to the relationship between Reese and Plaintiffs after he stopped working for RSAm on May 28, 2021.

Once the parties reached an impasse on these issues, Mr. Lankford sent Mr. Reese a letter dated August 6, 2021, notifying him of LSC's position on Mr. Reese's relationship with LSC.  Citing Mr. Reese's purported revocation of the May 19th separation agreement, Mr. Lankford reserved any rights regarding the validity and enforceability of that alleged agreement.  [DE 148-64; *see also* DE 158 at 35–36].  Mr. Lankford also told Mr. Reese that LSC did not intend to purchase any of his

shares at that time; confirmed the percentages of his remaining ownership in LSC and three LSC-related companies; and advised Mr. Reese of his rights and obligations related to member meetings, distributions to owners, and restrictive covenants. [*Id.*]. After May 2021, neither Mr. Reese nor his wholly owned company, CCR TPA, Inc. was paid management fees or owner distributions. [DE 158 at 37].

Without employment, Mr. Reese took a series of jobs in the retirement industry starting in August 2021. For a while, he worked for a life insurance company as a retirement plan consultant. [DE 140-5 at 2–3; DE 158 at 62–63]. At the same time, he provided retirement planning consulting services through CCR TPA. [DE 140-5 at 4–5; DE 158 at 64]. One of CCR TPA's consulting clients was one of LSC's TPA competitors. [DE 140-5 at 7, 11–12; DE 158 at 64]. While consulting for LSC's competitor, an active LSC customer was referred to Mr. Reese. After communicating with Mr. Reese, that customer ended up leaving LSC and taking its business to the competitor. [DE 140-5 14; DE 158 at 65–66]. The competitor ended up terminating its consulting relationship with Mr. Reese and his company. [DE 140-5 at 7; DE 158 at 66]. Shortly thereafter, Mr. Reese began working as a retirement plan consultant for a bank where he remained employed at the time of his deposition in December 2022. [DE 140-5 at 5; DE 158 at 66–67].

Despite no longer being employed by any LSC-related company, Mr. Reese considered himself a shareholder of both LSC and Highland until December 30, 2022. [DE 140-1 at 8–9; DE 148 at 18]. Based on a majority vote of shareholders at a special meeting on September 30, 2022, LSC underwent another restructuring whereby Highland and LSC were merged into a single holding company effective December 30, 2022. [DE 140-1 at 9; DE 148-66; DE 148 at 18–19]. Mr. Reese voted against the merger twice and then exercised his rights under the Indiana dissenter's rights statute. [DE 148 at 19]. Accordingly, LSC and Highland tendered checks to Mr. Reese for the value

of his shares on December 29, 2022, ending Mr. Reese's ownership interests in LSC and Highland. [*Id.*; DE 148-67, 148-68, 148-69].

The parties' claims in this case arise from these events and the resulting disputes. Ultimately, the parties want to know whether their conduct after May 2021 breached their contractual and fiduciary duties. Specifically, Plaintiffs contend that Mr. Reese's employment and communications breached enforceable restrictive covenants and fiduciary duties applicable to him as a shareholder while Mr. Reese contends that Plaintiffs and Third-Party Defendants breached their contractual obligations and fiduciary duties by failing to engage him in shareholder business and pay him shareholder distributions. The parties' cross motions for partial summary judgment raise issues that will lead to a full and complete resolution of their disputes down the road. To reach that point, the Court must first determine whether the 2009 NLG Shareholder Agreement, the 2009 Highland Shareholder Agreement, the 2014 NLG Shareholder Agreement, the 2017 Imperium Shareholder Agreement, and the 2021 separation agreement are valid and enforceable contracts. The status of these agreements will determine when Mr. Reese stopped being a shareholder as well as the scope of duties, obligations, and restrictive covenants applicable to him, Plaintiffs, and Third-Party Defendants. From there, the parties' disputes arising from their post-May 2021 conduct can be resolved.

## II.  ANALYSIS

### A.    Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

To determine whether a genuine dispute of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003). The court must not "sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). The court does not have to conduct research or develop arguments for parties either. *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011); *see also United States v. Beavers*, 756 F.3d 1044, 1059 (7th Cir. 2014) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived.").

"To defeat a motion for summary judgment, the non-moving party cannot rest on the mere allegations or denials contained in his pleadings, but must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (internal quotations omitted), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016). "Summary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (quotations omitted); *see also Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010).

### B.      Choice of Law

Before turning to the contract issues presented by the parties, the preliminary matter of which state's laws apply to those issues must be decided. The 2017 Contribution Agreement and 2017 Plan of Reorganization, which no party challenges in this action, include choice of law provisions establishing that Indiana law governs both agreements. [DE 140-4 at 10, 15]. Yet both parties have cited Ohio law in briefing the cross motions for summary judgment without developing

any authority or argument that Ohio law should be applied to any issue in this case.  [DE 141 at 16; DE 148 at 19–23; 32].  In a footnote, Plaintiffs alerts the Court to a possible choice of law issue in one sentence that says:  "Mr. Reese has suggested that Ohio law may apply to this issue," referencing Mr. Reese's Statute of Frauds arguments and citing Mr. Reese's memorandum in support of his original motion for partial summary judgment.[1]  [DE 141 at 16 (citing DE 40 at 10 n.45)].  Mr. Reese's Footnote 45 cites to the Ohio and Indiana Statute of Frauds code provisions then notes, without further explanation, that he lived and worked in Ohio and that any execution of the relevant contract would have occurred in Ohio.  [DE 40 at 10 n.45].  To address any potential choice of law issue that might arise from these limited statements, the Court turns to Indiana law.

To resolve a choice-of-law issue, this Court "must apply the choice-of-law provisions [of Indiana,] the state in which it sits." *Bailey v. Skipperliner Indus., Inc.*, 278 F. Supp. 2d 945, 951 (N.D. Ind. 2003) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941); *see also Large v. Mobile Tool Int'l, Inc.*, 724 F.3d 766, 771 (7th Cir. 2013) (citing *Erie v. Tompkins*, 304 U.S. 64, 78 (1938)); *Hubbard Mfg. Co., Inc. v. Greeson*, 515 N.E.2d 1071, 1073 (Ind. 1987).  In Indiana, "a choice-of-law issue will [ordinarily] be resolved only if it appears there is a difference in the laws of the potentially applicable jurisdictions." *Allen v. Great Am. Rsrv. Ins. Co.*, 766 N.E.2d 1157, 1162 (Ind. 2002).  "Indiana choice-of-law doctrine favors contractual stipulations as to governing law." *Id.*

Here, the parties have not argued that a substantive difference exists between Ohio and Indiana law affecting the claims in this case.  The parties have not raised any challenge to application of the choice-of-law provisions in the 2017 Contribution Agreement and 2017 Plan of Reorganization either.  Therefore, any such arguments are waived, and Indiana law will be applied to all claims in this case.  *See Nelson*, 657 F.3d at 590; *Beavers*, 756 F.3d at 1059.

---

[1] Mr. Reese's original motion for partial summary judgment [DE 39] was denied as moot [DE 88] upon the filing of Plaintiffs' Second Amended Complaint [DE 84].

C.       2009 NLG and 2009 Highland Shareholder Agreements

Through Count 3 of his Counterclaims/Third Party Complaint, Mr. Reese seeks declaratory judgment that the 2009 NLG Shareholder Agreement [DE 148-8] and the 2009 Highland Shareholder Agreement [DE 148-9] were superseded, replaced, and terminated by the 2014 NLG Shareholder Agreement [DE 140-3], as expressly set forth in Section 6.15 of the 2014 NLG Shareholder Agreement.  Section 6.15 states:

> 6.15   Entire Agreement: . . . [T]his Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all previous agreements, whether written or oral, relating to the same subject matters, (including, without limitation, the Niles Lankford Group, Inc. Buy-Sell Agreement dated March 22, 1989, the Niles Lankford Group, Inc. Amended and Restated Buy-Sell Agreement dated November 15, 2005, the Niles Lankford Group, Inc. Buy-Sell Agreement dated September 23, 2009 and the Highland Management Group, Inc. Buy-Sell Agreement dated September 23, 2009), except as to the application and enforcement of a prior Shareholder Agreement which remains binding on any non-signatory to this Agreement. All such previous agreements, if any, among the Parties ( or any of them) are hereby terminated and shall have no further force or effect.

[*Id.* at 19].  Plaintiffs make no argument to suggest that the 2009 NLG Shareholder Agreement remains in force and full effect.  Therefore, any such argument is waived.  *See Nelson*, 657 F.3d at 590*; Beavers*, 756 F.3d at 1059.  Accordingly, Mr. Reese is entitled to judgment as a matter of law and declaratory judgment that the 2009 NLG Shareholder Agreement [DE 148-8] is superseded, replaced, and terminated by the 2014 NLG Shareholder Agreement.

Plaintiffs do argue, however, that the 2009 Highland Shareholder Agreement remains in full force and effect.  Plaintiffs contend that the reference to "the Highland Management Group, Inc. Buy-Sell Agreement dated September 23, 2009" in Section 6.15 was a scrivener's error because the ownership of Highland was not a subject of the 2014 NLG Shareholder Agreement, no document exists with the title "Highland Management Buy-Sell Agreement," and Highland was not a party to the 2014 NLG Shareholder Agreement.  To start, the use of the "Buy-Sell Agreement" language is not persuasive because it is undisputed that the shareholders routinely referred to the 2009 Highland

Shareholder Agreement as "the Buy-Sell Agreement."  Both Mr. Pyle and Mr. Lankford testified as such.  [DE 148-5 at 110–11; DE 148-2 at 29].

In support of its scrivener's error argument, Plaintiffs cite Mr. Reese's testimony in December 2022 and Mr. Pyle's testimony in January 2023 that they believed that the 2009 Highland Shareholder Agreement still governed the relationship between Highland's shareholders.  [*See* DE 148-72 at 158; 148-1 at 52].  "A scrivener's error permits reformation of an agreement only when there is evidence that both parties were mistaken as to the contents of the agreement. *Parker v. Hostetler*, No. 3:07 CV 336, 2015 WL 5177637, at *16 (N.D. Ind. Sept. 4, 2015) (citing *Harlan Bakeries, Inc. v. Muncy*, 835 N.E.2d 1018, 1030 (Ind. Ct. App. 2005)).  "[T]he scrivener's error doctrine in Indiana requires the party making such an argument to show by convincing evidence that the alleged mistake does not reflect the true intent of the parties." *Heritage Techs., L.L.C. v. Phibro-Tech, Inc.*, No. 1:05-cv-1851-LJM-WTL, 2008 WL 45380, *8 (S.D. Ind. Jan. 2, 2008) (citing *Payton v. Hadley*, 819 N.E.2d 432, 440 (Ind. Ct. App. 2004)).  In *Parker*, the drafter of the document testified that he inadvertently referenced an individual where he intended to reference a trust, and that this one-word drafting error was the alleged mutual mistake.  2005 WL 5177637, at *16.  This Court rejected the scrivener's error argument noting there was "simply no evidence, disputed or otherwise, showing that [the parties were] mistaken as to the contents of the [relevant] agreement." *Id.*

Here, if no scrivener's error exists, the 2009 Highland Shareholder Agreement will be deemed terminated as of October 1, 2014, when the 2014 NLG Shareholder Agreement was executed thereby ending any contractual obligations under the Highland agreement as of that date.  The evidence of a scrivener's error before the Court now is limited to the testimony of Mr. Reese and Mr. Pyle.  They both seem to think the 2014 NLG Shareholder Agreement did not terminate the 2009 Highland Shareholder Agreement.  However, their testimony was taken about 8 years after the 2014 NLG Shareholder Agreement was drafted and included no discussion of facts

contemporaneous to its drafting—just testimony of their beliefs long after the Agreement was drafted. Neither claims to have been the drafter of the 2014 NLG Agreement or to having any knowledge as to the drafting of the document in 2014. When rejecting the scrivener's error argument in *Parker*, this Court at least had testimony from the drafter of the document at issue. Plaintiffs here present even less evidence in their attempt to show that a mutual mistake in drafting led to inclusion of the Highland Agreement in Section 6.15 of the 2014 NLG Shareholder Agreement or that inclusion of the Highland Agreement was not the actual intent of the parties at the time.

Plaintiffs inference that the 2009 Highland Shareholder Agreement was included in Section 6.15 by mistake based on other language in the 2014 NLG Shareholder Agreement does not meet the burden to establish a scrivener's error either. Plaintiffs note that the ownership of only NLG, PSI, and RSC was the subject of the 2014 NLG Shareholder Agreement, not the ownership of Highland, and that Highland was not a named party to the 2014 NLG Shareholder Agreement. From that, Plaintiffs infer that it would be illogical for the 2009 Highland Shareholder Agreement to be affected in any way by the 2014 NLG Shareholder Agreement.

Such an inference flies in the face of basic contract interpretation principles. "The intention of the parties to a written contract must be derived from their written expressions within the four corners of the contract." *Perfect v. McAndrew*, 798 N.E.2d 470, 479 (Ind. Ct. App. 2003). "Unambiguous contracts must be specifically enforced as written without any additions or deletions by the court." *Id.* Extrinsic evidence is only considered in determining the meaning of a contract when its language is ambiguous or uncertain. *Id.* "A contract is ambiguous if reasonably intelligent people could find its provisions susceptible to more than one interpretation." *Id.* Despite Plaintiffs' inference, Section 6.15 is unambiguous as to the 2009 Highland Shareholder Agreement.

Reasonably intelligent people could find that Section 6.15, based on its plain language, intended the termination of the 2009 Highland Shareholder Agreement.

Therefore, Plaintiffs have not established by clear and convincing evidence that a mistake occurred in 2014 when Section 6.15 of the NLG Shareholder Agreement was drafted to terminate the 2009 Highland Shareholder Agreement along with the 2009 NLG Shareholder Agreement. *See Heritage Techs., L.L.C.*, 2008 WL 45380, at *8. Without more, Plaintiffs have not met their burden to overcome the plain, unambiguous language of Section 6.15 or put up sufficient evidence to meet the elements of a scrivener's error. As such, the record reflects no dispute of fact as to when the parties' contractual obligations under the 2009 Highland Shareholder Agreement ended. They ended on October 1, 2014, with the execution of the 2014 NLG Shareholder Agreement, and the resulting termination of the 2009 Highland Shareholder Agreement. Mr. Reese is entitled to judgment as a matter of law accordingly.

### D.    2014 NLG Shareholder Agreement

Through Count 1 of his Counterclaims/Third Party Complaint, Mr. Reese seeks declaratory judgment that the 2014 NLG Shareholder Agreement [DE 140-3] terminated in December 2017 when all shares in NLG, PSI, and RSC were transferred to Imperium. [DE 148-8]. Plaintiffs note that Section 4 of the 2017 Contribution Agreement, titled "Termination of Shareholder Agreements," expressly terminated the 2014 NLG Shareholder Agreement on December 31, 2017, when it was executed. [DE 140-4 at 10]. While the parties disagree about which even or act terminated the 2014 NLG Shareholder Agreement, they agree that the 2014 NLG Shareholder Agreement was terminated at the end of December 2017. Thus, with no dispute between the parties, the 2014 NLG Shareholder Agreement has been terminated. Mr. Reese is entitled to judgment as a matter of law accordingly.

E.       **2017 Imperium Shareholder Agreement**

The 2017 Imperium Shareholder Agreement was one of four documents relevant to the consolidation of NLG and the Affiliated TPAs into the new company, Imperium Holdings, Inc. As a shareholder, Mr. Reese was part of that restructuring in 2017. He now challenges the validity and enforceability of the 2017 Imperium Shareholder Agreement based on events in 2017 and 2022.

1.       **Relevant Facts**

The restructuring, and the reasoning behind it, were summarized in the 2017 Joint Written Consent signed by all shareholders, including Mr. Reese. [DE 140-4 at 1–8]. It authorized the officers of Imperium—President and CEO Brad Lankford, Treasurer Trent Newcomb, and Secretary Keith Pyle—and each Affiliate TPA to do several things including "negotiate, execute and deliver" any agreements "necessary, convenient or appropriate to consummate the Reorganization," including a Contribution Agreement and Plan of Reorganization, which were attached as exhibits to the 2017 Joint Written Consent, as well as "a Shareholder Agreement by and among [Imperium] and its Shareholders." [DE 140-4 at 2; DE 148-11 at 1; *see also* DE 158 at 12].

The Contribution Agreement accomplished the consolidation portion of the reorganization with provisions governing the shareholders' capital contributions of their shares in the Affiliated TPAs to Imperium. [DE 148 at 7; DE 140-4 at 9]. The Contribution Agreement also expressly terminated the 2014 NLG Shareholder Agreement. [DE 148 at 7; DE 140-4 at 10]. The Plan of Reorganization detailed the conversions of the Affiliate TPAs from single member corporations into single member LLCs for tax purposes. [DE 148 at 7; DE 140-4 at 13–16]. The 2017 Imperium Shareholder Agreement was not attached to the 2017 Joint Written Consent but was among the restructuring documents for which the shareholders were asked to submit a signature page in December 2017.

At Mr. Pyle's request, a paralegal at the Taft law firm named Michelle sent Mr. Reese and all the shareholders packets of signature pages for restructuring documents including the 2017 Joint Written Consent, Contribution Agreement, Plan of Reorganization, and 2017 Imperium Shareholder Agreement via email on December 28, 2017. [DE 140-8 at 1]. The first page of the packets included the following chart describing the document to which each signature page corresponded.

**NILES LANKFORD GROUP, INC.**

**Restructure / Redomestication Transactions**

**Signature Pages for Clinton C. Reese**

| | Document: | Number of Pages | To be signed by |
|---|---|---|---|
| | **Reorganization/Conversion Transactions** | | |
| 1. | Contribution Agreement | 1 | Clinton |
| 2. | Plan of Reorganization | 1 | Clinton |
| 3. | Shareholder Agreement | 1 | Clinton |
| 4. | Transfer Powers (1 for each Company: NLG, PSI, RSA, RSC) | 4 | Clinton |
| | **Organization of Imperium Holdings, Inc.** | | |
| 5. | Subscription Agreement (Imperium) | 1 | Clinton |
| | **Authorizing Resolutions** | | |
| 6. | Joint Board/Shareholder Consent (reorg) | 1 | Clinton |
| | **Redomestication of Retirement Systems of America, LLC** | | |
| 7. | Joint Manager/Member Consent | 1 | Clinton |

21791427

[DE 140-9 at 1]. None of the restructuring documents were attached to the signature packet email. According to Mr. Pyle's Affidavit, they were all saved in a shared electronic folder ("L:/Drive") that all shareholders could access to review the documents. [DE 140-1 at 4]. Mr. Pyle describes the L:/Drive as housing "organizational documents (for the various companies), banking documents, client contract documents, and other documents of legal significance." [*Id.*]. While Michelle's signature-page email did not mention the L:/Drive explicitly, Mr. Reese was aware of the Drive before December 2017 as evidenced by an email he received on July 13, 2017, unrelated to the 2017 restructuring, directing his attention to documents on "the L: Drive – L:\Secure K/Website." [*Id.* at

11].  And Mr. Reese clearly knew about the shared drive by January 30, 2018, when he sent Mr. Pyle an email on a separate matter and directed his attention to "the L: Drive."  [*Id.* at 12].  Yet in response to Plaintiffs' Statement of Material Facts related to the instant motions, Mr. Reese states that he "never accessed the 'Legal Drive' to review any documents."  [DE 148-71 at 2].

Even so, Mr. Reese signed and returned all ten of the signature pages on the morning of December 29, 2017, the day after he received them, without asking any questions or putting any limitations on his signatures or the agreement they evidenced.  [DE 148-22 at 1; DE 140-11].  Mr. Reese's cover email simply stated:

> Michelle,
> Here are the signature pages.
> I'm sending the originals to your attention.

[DE 148-22 at 1].  Nobody questioned the validity or enforceability of the 2017 Imperium Shareholder Agreement until June 2021 when Mr. Reese secured counsel to advise on a proposed separation agreement.  As part of that process, the attorney reviewed a Highland shareholder agreement and an NLG shareholder agreement that had been provided to him.  Finding them somewhat outdated, the attorney requested all relevant shareholder or buy-sell agreements for all the relevant companies from Mr. Pyle.  [DE 148-61].  In response, Mr. Pyle produced the 2014 NLG Shareholder Agreement, not the 2017 Imperium Shareholder Agreement.  [DE 148-1 at 159–60; DE 148-10].  Plaintiffs did not present a copy of the 2017 Imperium Shareholder Agreement until Mr. Reese's deposition for this case in December 2022.  [DE 148-72 at 177–80].

Until then, Mr. Reese had assumed that the basis of this case—filed about 18 months earlier—was the 2014 NLG Shareholder Agreement.  LSC had named the 2014 NLG Shareholder Agreement as the shareholder agreement at issue in both its original complaint [DE 4 at 3–4] and its amended complaint [DE 24 at 3–4].  LSC even attached the 2014 NLG Shareholder Agreement to its amended complaint.  [DE 24-3].  Then at Mr. Reese's deposition on December 19, 2022, he was

questioned about the 2017 Imperium Shareholder Agreement, which he testified he had never seen and could not have signed in 2017 because he had never seen it. [DE 148-72 at 177–80]. LSC had re-discovered the 2017 Imperium Shareholder Agreement in November 2022 while searching for information responsive to Mr. Reese's discovery requests in this case. [DE 72 at 14–15]. With this Court's permission, LSC filed a Second Amended Complaint in March 2023 amending Count I by substituting the 2017 Imperium Shareholder Agreement for the 2014 NLG Shareholder Agreement as the relevant shareholder agreement. [DE 84 at16–17; DE 84-6].

Now Mr. Reese challenges the validity and enforceability of the 2017 Imperium Shareholder Agreement arguing that (1) it did not exist in 2017 but was created by LSC in 2022 after Mr. Pyle found it during discovery in this case; (2) it was not offered, communicated, or disclosed to him before December 2022; and (3) he never executed the 2017 Imperium Shareholder Agreement despite the attached signature page. Therefore, Mr. Reese contends that a valid contract was never formed, and its terms cannot be enforced as a result.

### 2.    The 2017 Imperium Shareholder Agreement Document

The document Plaintiffs seek to enforce as the 2017 Imperium Shareholder Agreement was attached as an exhibit to their Second Amended Complaint[2]. [DE 85-1]. Plaintiffs attached the same document as an exhibit in support of their instant motion for partial summary judgment. [DE 140-6]. Mr. Reese argues that this version of the document was created in 2022 from a redline Microsoft Word document and could not have been executed in December 2017 as Plaintiffs allege because it did not exist until 2022.

Plaintiffs do not dispute that in November 2022, Mr. Pyle discovered a Word document named "Imperium Holdings – Shareholder Agreement (draft for 12-31-17 reorg).DOCX" ("the

---

[2] Plaintiffs supplemented their Second Amended Complaint with a replacement exhibit [DE 85-1] for the 2017 Imperium Shareholder Agreement originally attached [DE 84-6] because not all the pages were filed due to an error. [DE 85].

Word Document") and last modified on December 17, 2017, at 6:21PM in the L:/ Drive, and that it was disclosed to Mr. Reese in December 2022. [DE 140-1 at 5]. However, Mr. Pyle testified under oath in his Affidavit dated November 15, 2023, that the Word Document is the same, "clean" document attached to the Second Amended Complaint and Plaintiffs' motion for partial summary judgment that they seek to enforce. [DE 140-1 at 5 (citing DE 140-6)]. Mr. Reese contends that the Word Document was a redlined draft of the 2017 Imperium Shareholder Agreement with a header "TAFT TWEAKS 12/12/17" showing edits to the 2014 NLG Shareholder Agreement. Mr. Reese accuses LSC of creating a new, "clean version" of the Word Document in 2022 by toggling off the red-line edits and printing the document, then misrepresenting which version was allegedly provided to the shareholders in December 2017 for signatures. [DE 159 at 9]. Plaintiffs acknowledge that a separate redline version of the 2017 Imperium Shareholder Agreement exists but reject Mr. Reese's accusations of manipulating the document improperly.

To start, the screenshot of the L:/Drive folder containing the Word Document, and cited by both parties, only clarifies that a document with the filename "Imperium Holdings – Shareholder Agreement (draft for 12-31-17 reorg).DOCX" was last modified on December 17, 2017, but provides no evidence to confirm whether that document was the redline version as Mr. Reese contends or the clean version attached to the Second Amended Complaint as Plaintiffs contend. The screenshot does not even confirm that both versions were saved in the L:/Drive.

Regardless, the record includes no evidence that LSC improperly manipulated the Word Document to create a new document in 2022 that it is trying to pass off now as the 2017 Imperium Shareholder Agreement at issue in this case. Mr. Reese cites to the deposition testimony of Shareholders Lankford and Gossard that they did not recall seeing the redline version of the 2017 Agreement as evidence that no one knew about the 2017 Agreement in December 2017 when they were asked to sign it. But Mr. Reese fails to mention that Mr. Lankford and Mr. Gossard testified

that they did recall the "clean" version of the 2017 Imperium Shareholder Agreement attached to Plaintiffs' Second Amended Complaint.  [DE 158-1 at 2–6; DE 148-4 at 48].

Mr. Reese also argues that the 2017 Imperium Shareholder Agreement attached to Plaintiffs' Second Amended Complaint was never intended to be the final, executed version of the agreement because LSC and its law firm continued to edit the document after December 2017.  Mr. Reese cites to a redline draft labeled "TAFT TWEAKS ~~1~~23/~~12~~21/~~17~~18" [DE 143-33] and another non-redline draft labeled "Imperium TWEAKS 5/2/18" [DE 143-34].  Yet discussing or drafting proposed revisions to a contract do not undercut the enforceability of the existing contract.  *See Perfect*, 798 N.E.2d at 479 ("The intention of the parties to a written contract must be derived from their written expressions within the four corners of the contract.").  And Plaintiffs are not trying to enforce any of the revisions reflected in either 2018 draft.  Rather they contend that the 2017 Imperium Shareholder Agreement was executed in full by all the shareholders, including Mr. Reese, in December 2017.  Mr. Reese has not shown that the March and May 2018 revisions are material to the validity and enforceability of the 2017 Imperium Shareholder Agreement attached to Plaintiffs' Second Amended Complaint.

Accordingly, the 2017 Imperium Shareholder Agreement attached to Plaintiffs' Second Amended Complaint [DE 85-1; DE 140-6] will now be analyzed to determine whether it was executed as Plaintiffs allege in December 2017.

### 3.    Reese's Execution of the 2017 Imperium Shareholder Agreement

Under Indiana law, "[a] meeting of the minds of the contracting parties, having the same intent, is essential to the formation of a contract." *Fox Dev., Inc. v. England*, 837 N.E.2d 161, 165 (Ind. Ct. App. 2005).  "A valid contract requires offer, acceptance, consideration, and manifestation of mutual assent." *Martins v. Hill*, 121 N.E.3d 1066, 1068 (Ind. Ct. App. 2019).  "It is well settled that in order for an offer and an acceptance to constitute a contract, the acceptance must meet and

correspond with the offer in every respect." *Id.* at 1070 (quoting *I.C.C. Protective Coatings, Inc. v. A.E. Staley Mfg. Co.*, 695 N.E.2d 1030, 1034 (Ind. Ct. App. 1998), trans. denied.). "[An] offeree cannot accept an offer unless its terms have been communicated to him by the offeror." *Alfaro v. Stauffer Chem. Co.*, 362 N.E.2d 500, 505 (Ind. Ct. App. 1977) (internal citations omitted). "Whether a set of facts establishes a contract is a question of law." *Fox Dev., Inc.*, 837 N.E.2d at 165.

Mr. Reese argues that the 2017 Imperium Shareholder Agreement, as Plaintiffs seek to enforce, was not offered, communicated, or disclosed to him before December 2022, about 18 months into this litigation. He also argues that the signature page cited by Plaintiffs did not manifest his assent to the 2017 Imperium Shareholder Agreement. Mr. Reese's arguments do not account for the full range of facts surrounding the execution of the restructuring documents by the shareholders, including himself. As Plaintiffs demonstrate, Mr. Reese knowingly signed the 2017 Imperium Shareholder Agreement.

First, Mr. Reese was informed of the 2017 Imperium Shareholder Agreement no later than December 28, 2017, when the signature page packet was emailed to him. Mr. Reese's packet included 10 signature pages. [DE 140-8 through DE 140-11]. The chart accompanying the packet specified the documents corresponding to each signature page. [DE 140-9]. The chart indicated that Mr. Reese was provided one signature page for "Shareholder Agreement" under the heading "**Reorganization/Conversion Transactions**." [*Id.* (emphasis in original)]. This should have been enough to make Mr. Reese aware of the 2017 Imperium Shareholder Agreement on its own. Beyond this, however, Mr. Reese knew about the L:/Drive, or shared electronic folder where the "Imperium Holdings – Shareholder Agreement (draft for 12-31-17 reorg)" Word document, last modified on December 17, 2017, was saved for access by any shareholder. He had been directed to the L:/Drive on another matter in July 2017. [DE 140-1 at 11]. While no one placed a paper copy of the 2017 Imperium Shareholder Agreement in Mr. Reese's hands in December 2017, Mr. Reese

was provided with enough information from which to know that such a document existed.  And that does not even account for shareholder restructuring discussions he participated in that presumably mentioned all four of the necessary restructuring documents, including the new shareholder agreement.

Even if none of that effectively communicated the existence of the 2017 Imperium Shareholder Agreement, or how to access it for review, to Mr. Reese , Mr. Reese demonstrated his knowledge of the Agreement when he returned the signature page designated for it promptly the next day.  "[I]t is a fundamental principle of contract law that a person who signs a contract is presumed to know its terms and consents to be bound by them." *Paper Exp., Ltd. v. Pfankuch Maschinen GmbH*, 972 F.2d 753, 757 (7th Cir. 1992); *see also Buschman v. ADS Corp.*, 782 N.E.2d 423, 428 (Ind. Ct. App. 2003) ("Under Indiana law, a person is presumed to understand and assent to the terms of the contracts he signs.").  Mr. Reese returned the signed signature pages without requesting a copy of any of the documents for review or otherwise expressing conditions or reservations regarding the timing or effect of his signature.  Mr. Reese suggests that he did not authorize attachment of the signature page he signed to the 2017 Imperium Shareholder Agreement because he did not provide anyone with a general power of attorney under Ind. Code § 30-5-4-1.  But Mr. Reese develops his argument no further thereby waiving any such argument, especially in light of the principles of contract law on the effect of signatures.  *See Nelson*, 657 F.3d at 590; *Beavers*, 756 F.3d at 1059; *Paper Exp. Ltd.*, 972 F.2d at 757; *accord Palmer v. Menard, Inc.*, No. 3:12 CV 828, 2014 WL 835632, at *3 (N.D. Ind. Mar. 4, 2014) ("plaintiff's contentions that he was not given an opportunity to review the agreement before signing and that the [employer] failed to explain the terms of the agreement are not sufficient to create a genuine issue of material fact on whether a valid arbitration agreement was formed.").

Second, the intent of parties to be bound by a contract is interpreted objectively by their outward manifestations of intent, not their subjective intents. *Real Est. Support Servs., Inc. v. Nauman*, 644 N.E.2d 907, 910 (Ind. Ct. App. 1994). Mr. Reese's signature on the signature pages— voluntarily given—demonstrates objectively his assent to all the agreements referenced in the packet. *See Janiga v. Questar Cap. Corp.*, 615 F.3d 735, 743 (7th Cir. 2010). His affidavit dated December 22, 2023, now avers that he returned the signed signature pages not as a sign of his assent to the underlying documents, but for the Taft law firm "to hold in trust and confidence until the actual documents were sent to [him] for review and approval." [DE 148-71 at 2]. Mr. Reese's subjective intent, however, is meaningless in determining whether he assented to the 2017 Imperium Shareholder Agreement. What matters is his words and conduct. *Cf. Block v. Magura*, 949 N.E.2d 1261, 1267 n.2 (Ind. Ct. App. 2011) ("While in his affidavit Magura averred he did not intend to be bound by the Letter of Intent unless and until a formal agreement was subsequently executed, Magura's subjective understanding in that regard is insufficient to create a genuine issue of fact because intent to be bound is measured objectively, by the parties' words and conduct, not their subjective state of mind."). Mr. Reese provided his signature on December 29, 2017, without explanation, limitation, or reservation. Mr. Reese assented to the 2017 Imperium Shareholder Agreement.

Third, "a person is presumed to understand the documents which he signs and cannot be released from the terms of a contract due to his failure to read it." *Clanton v. United States*, 686 N.E.2d 896, 899–900 (Ind. Ct. App. 1997); *see also Pinnacle Comput. Servs., Inc. v. Ameritech Pub., Inc.*, 642 N.E.2d 1011, 1017 (Ind. Ct. App. 1994) ("[a party] is bound to know the contents of the contract which he signs."). Regardless of whether Mr. Reese saw or read the 2017 Imperium Shareholder Agreement, he signed it. He does not question that he executed the other three reorganization documents with his signature on signature pages in the same packet. [*See* DE 140-5

at 15; DE 87 at 7, 29–30]. Therefore, Mr. Reese objectively manifested his assent to the 2017 Imperium Shareholder Agreement through the signature page he returned to Michelle at Taft law firm on December 29, 2017, thereby executing the agreement, and Mr. Reese will be held to its terms accordingly. No attention to Plaintiffs' alternative implied-in-fact shareholder agreement argument is required.

      **F.**        **2021 Separation Agreement**

      Throughout April and May 2021, Mr. Reese negotiated on his own with LSC's Keith Pyle regarding the terms of his employment separation and ownership buyout. A telephone call between Mr. Pyle and Mr. Reese on May 19, 2021, led Mr. Pyle to email a document entitled "Proposed Terms regarding Clint Reese Termination and Buyout" ("Term Sheet") to Mr. Reese later that day. [DE 140-17]. In his email, Mr. Pyle referred to the document as "the final term sheet" and asked Mr. Reese to confirm he was "in agreement" stating that an agreement would be drafted if he agreed. [DE 140-13 at 6–7].

      The Term Sheet began with the following statement:

> The terms included herein are <u>not</u> intended to constitute a binding or enforceable agreement upon any of the parties hereto. Included below are the basic proposed terms regarding employment separation and ownership buyout of Reese from all ownership in Latitude and its related companies ("the Company") and interests. If the terms laid out below are agreeable, we will draft the appropriate agreement(s) and related documents to effect the transaction.

[DE 140-17 (emphasis in original)]. The Term Sheet then laid out proposed terms starting with a statement that Reese would voluntarily terminate his employment. [*Id.*]. The remainder of the document specified details about the following topics, which had been the subject of the parties' recent negotiations.

- Equity buyout of interest in all companies
- Buyout payment terms
- Employer provided health insurance
- Severance payment

- Debt forgiveness
- Non-competition/Restrictive Covenants
- Tag-along Rights/Adjusted purchase price due to future sale of the Company
- Letters of Separation
- On-going business relationship, referral compensation, etc.

[*Id.*].  Mr. Reese responded by email less than four hours later with the following message:

> Keith,
> I agree with the terms listed in the attached PDF.

[DE 140-13 ("the Agreement Email")].

On May 20, 2021, Mr. Reese asked Mr. Pyle to send the completed agreement to him, and his attorney, when it was ready.  [DE 148-60 at 1].  On May 27, 2021, Mr. Pyle emailed both Mr. Reese and his attorney what he called "drafts of the separation agreement and transfer powers," in a document entitled "Redemption and Separation Agreement," and asked for their thoughts.  [DE 148-60 at 1; *see also* DE 148-57].  Mr. Reese stopped working for RSAm at the end of May without having signed the Redemption and Separation Agreement.

Communications continued, however, between LSC's outside counsel and Mr. Reese's attorney about the proposed agreement.  LSC argued that the May 19th Pyle-Reese phone call, Term Sheet, and Agreement Email together created a binding and enforceable contract governing the termination of Mr. Reese's employment and the buyout of his LSC-related shares.  In an email dated June 28, 2021, Mr. Reese's attorney rejected LSC's assessment based on the Statute of Frauds, disclaimer language at the top of the Term Sheet, and requirements for waiver of ADEA rights.  [DE 148-63 at 1].  Those same arguments are raised here on summary judgment.

To start, the negotiation and memorialization process followed by Mr. Pyle and Mr. Reese in their efforts to define the terms of separation mirrors the typical process used by parties pursing settlement in litigation.  Like LSC and Reese, parties working to settle litigation engage in discussion amongst themselves, or with the assistance of a mediator or judge; document in writing the resulting

agreement immediately; secure the parties' signatures on that written agreement; and then use the agreed terms in that preliminary agreement as the foundation of a final settlement agreement drafted later. Thus, Plaintiffs' attempt to enforce the May 2021 separation terms is analogous to the enforcement of settlement agreements. Accordingly, the law for enforcing settlement agreements will be applied to the alleged LSC-Reese separation agreement.

"State contract law governs issues concerning the formation, construction and enforcement of settlement agreements." *Beverly v. Abbott Lab'ys*, 817 F.3d 328, 333 (7th Cir. 2016).

> To determine whether a contract is enforceable, there are two interrelated areas that must be considered: intent to be bound and definiteness of term. Only essential terms need be included in order to render a contract enforceable. Whether the parties intended to execute a subsequent written document is relevant to the determination of intent to be bound. Parties may make an enforceable contract which obligates them to execute a subsequent final written agreement. However, it is necessary that agreement shall have been expressed on all essential terms that are to be incorporated in the document.

*MH Equity Managing Member, LLC v. Sands*, 938 N.E.2d 750, 757 (Ind. Ct. App. 2010) (cleaned up).

"[P]arties may make an enforceable contract which obligates them to execute a subsequent final written agreement." *Block*, 949 N.E.2d at 1266 (citing *Wolvos v. Meyer*, 668 N.E.2d 671, 674 (Ind. 1996)). Such a contract contains all the essential terms of the agreement such that the final written agreement "is understood to be a mere memorial of the agreement already reached and may not contain a material term that is not already agreed upon." *Wolvos*, 668 N.E.2d at 674–75. In other words, "preliminary agreements only become enforceable if they express all essential terms that are to be incorporated in the [subsequent] document." *Janky v. Batistatos*, 559 F. Supp. 2d 923, 930 (N.D. Ind. 2008) (citing *Wolvos*, 668 N.E.2d at 674). The May 19th phone call, Term Sheet, and Agreement Email, taken together, do not express all the essential terms of the alleged agreement as evidenced by the draft Redemption and Separation Agreement that LSC presented to Mr. Reese on May 27, 2021.

No one questions whether the Redemption and Separation Agreement [DE 148-57] incorporated the agreed terms memorialized on the Term Sheet. However, the Agreement includes a provision that requires Mr. Reese to release any claims, including but limited to federal or state law claims, against LSC, Highland, RSAm, and Latitude Holdings arising from his employment, his shareholder status, his separation of employment, the redemption of his equity, and anything occurring before the effective date of the Agreement ("the Release Provision"). [*Id.* at 4–5]. The parties have presented no evidence that Mr. Pyle and Mr. Reese discussed a release of claims during their May 19th phone call. And neither the Term Sheet nor the Agreement Email make any reference to a release of claims. The question thus becomes whether that release of claims is an essential term absent from, and therefore dooming the May 19th agreement.

Neither party directly argues that the Release Provision is an essential term of the alleged agreement. Yet courts have held similar preliminary agreements unenforceable when release terms are not sufficiently defined in them or are left open for future negotiation when drafting a final agreement. *See, e.g.*, *Janky,* 559 F. Supp. 2d at 930; *Abbott Laby's v. Alpha Therapeutic Corp.*, 164 F.3d 385, 388 (7th Cir. 1999). In *Janky*, this Court found a preliminary agreement, which included an unspecified mutual global release term, insufficient to create an enforceable agreement. 559 F. Supp. 2d at 930. In reaching that conclusion, the Court considered all the circumstances surrounding the alleged agreement, including the years of "tumultuous litigation" between the parties, before concluding that the preliminary agreement did not demonstrate the parties' agreement as to the essential release claim. *Id.* In *Abbott Laboratories*, release terms had been discussed in the preliminary agreement, but one party expressly planned to propose "more precise language regarding the release terms" to be included in the anticipated final settlement agreement. 164 F.3d at 390. The court found the preliminary agreement unenforceable reasoning that the release terms were "inherently

material" to the contract and that the details of the material terms remained open to negotiation, casting doubt on the intent to be bound by the release term. *Id.*

*Janky* and *Abbott Laboratories* offer valuable insight even though their facts differ from those at issue in this case. The facts here are more extreme. Release of claims was never mentioned by Mr. Pyle or Mr. Reese in their May 19th communications. Yet the Release Provision appeared in the Redemption and Separation Agreement presented to Mr. Reese. By requiring Mr. Reese to waive his legal rights, the Release Provision was inherently material to Mr. Reese's separation from LSC and its affiliates both in his capacity as an employee and as a shareholder. Moreover, any waiver of claims under federal statutes necessarily implicated Mr. Reese's legal rights under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.* given that he was over 40 years of age. And a waiver of rights under the ADEA is not valid unless the individual is given 21 days to review the waiver followed by 7 days to revoke the waiver. 29 C.F.R. § 1625.22(e). Not only did the May 19th communications lack any reference to the release, they lacked any reference to the review and revocation requirements mandatory for waiver, or release, of any ADEA claim.

"The failure to demonstrate agreement on essential terms of a purported contract negates mutual assent and hence there is no contract." *Ochoa v. Ford*, 641 N.E.2d 1042, 1044 (Ind. Ct. App. 1994). The Pyle-Reese phone call, Term Sheet, and Agreement Email of May 19, 2021, do not include all the essential elements of the alleged separation agreement and therefore do not reflect a meeting of the minds to form a valid contract. Regardless of whether the May 2019 communications satisfy the Statute of Frauds' writing and signature requirements under Ind. Code § 32-21-1-1 or whether the introductory language on the Term Sheet determines the parties' intent to be bound, as Mr. Reese has argued, LSC and Mr. Reese did not execute a valid and enforceable contract to govern Mr. Reese's separation from LSC or the redemption of his shares. Therefore, the

parties cannot be held to the terms discussed in the May 19th phone call, Term Sheet, and Agreement Email.

Accordingly, Mr. Reese remained a shareholder of LSC and the affiliated companies after he stopped working for RSAm at the end of May 2021. Mr. Reese's ongoing ownership interests at that time were outlined by Mr. Lankford in his letter dated August 6, 2021 [DE 148-64]. Mr. Reese's ownership interest undisputedly continued until December 30, 2022, after he had asserted his rights under the Indiana Dissenter's Statute, Ind. Code § 23-1-44-1, *et seq.*, and LSC had paid him the value of his shares. [DE 148-67 through 148-69]. Thus, Mr. Reese was entitled to all shareholder rights and obligated by all shareholder duties under the 2017 Imperium Shareholder Agreement and the common law until December 30, 2022.

### G.    Restrictive Covenants

Plaintiffs allege that between May 2021 and December 2022 Mr. Reese breached the restrictive covenants set forth in Section 5.1 and 5.2 of the 2017 Imperium Shareholder Agreement by (1) working for Lafayette Life Insurance Company, First Financial Bank, and SMS Retirement after he stopped working for RSAm in May 2021, and (2) inducing an LSC customer, McGuire Ink, to take its business to SMS after communicating with Mr. Reese. Mr. Reese does not deny that he worked for all three companies at different times between August 2021 and December 2022, or that he talked to the principal of McGuire Ink upon referral before departure from LSC. Instead, Mr. Reese argues that the (1) restrictive covenants do not apply to him because he is a "Forced-Out Shareholder" under Section 1.4 of the 2017 Imperium Shareholder Agreement; (2) the non-compete provision in Section 5.1 is overbroad making it unreasonable and unenforceable; and (3) he was under no obligation to comply with the terms of the Agreement after May 2021 when LSC breached the Agreement by withholding owner distributions from him. Plaintiffs reject Mr. Reese's

arguments but argue in the alternative that Mr. Reese breached his fiduciary duty as an LSC shareholder by the same acts of competition.

Sections 5.1 and 5.2 of the 2017 Imperium Shareholder Agreement are two restrictive covenants applicable to company shareholders, including Mr. Reese. Section 5.1 is a non-competition provision based on the shareholder's ownership status. [DE 140-6 at 14–15]. Current shareholders are prohibited from engaging in "a business that engages to any extent in the design, installation, recordkeeping and/or annual administration or actuarial certification of qualified retirement plan[s] . . ." (defined in the Agreement as a "Competing Business") throughout the United States while they own shares. [*Id.* at 14]. Former shareholders may not engage in a "Competing Business," within a 150-mile radius of a company office, for a two-year period post-ownership (with certain exceptions). [*Id.* at 14–15]. Section 5.2 is a non-solicitation provision restricting shareholders from, among other things, soliciting customers' business while owning shares and for a two-year period after that. [*Id.* at 14–15]. The post-ownership restrictions are not applicable to shareholders designated "Forced-Out Shareholders" under Section 1.4. [*Id.* at 15].

Plaintiffs' allegations of competition against Mr. Reese stem from his employment activity between August 2021 and December 2022. As discussed above, Mr. Reese retained his ownership rights as an LSC shareholder until December 2022. Therefore, he was a current shareholder, subject to the Agreement's restrictive covenants accordingly, after his employment ended in May 2021 until December 2022.

### 1.      Forced-Out Shareholder under Section 1.4

Mr. Reese argues that he qualified as a "Forced-Out Shareholder" in May 2021 because Plaintiffs "represented to third parties, including the Internal Revenue Service, that they took ownership of all of [his] shares in [LSC], Highland, and all Latitude Affiliates, effective May of 2021." [DE 149 at 31]. In support, Mr. Reese designates pages in Lynn Lankford's and Mr. Pyle's

deposition testimony, but neither mention any third parties or the IRS. [*See id.* (citing DE 148-3 at 83; DE 148-1 at 183–84)]. Moreover, Mr. Reese has designated no evidence to show that Plaintiffs provided him with the written notice to initiate the "Force Out" process delineated in Section 1.4 of the 2017 Imperium Shareholder Agreement in May 2021.

Mr. Reese also contends that "[m]ore recently, Mr. Lankford has voted in favor of the corporate action against Mr. Reese, forcing him to sell his ownership interest in Latitude and Highland." [*Id.*]. In support, Mr. Reese designates deposition testimony addressing events in both May 2021 and September 2022 leaving it unclear exactly which vote he is describing. [*See id.* (citing DE 148-1 at 178; DE 148-2 at 169–70)]. Regardless, Mr. Reese again presents no evidence of compliance with the Section 1.4 "Force-Out" process. Thus, Mr. Reese has not clearly articulated allegations of "Force-Out" or developed an argument in support.

This Court will not scour the record to locate evidence of Mr. Reese's concerns. *Alexander v. City of South Bend,* 433 F.3d 550, 556 (7th Cir. 2006). This Court is not a "pig[] hunting for truffles buried in briefs" or "archaeologists" searching the record to identify issues or evidence for any party. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991); *DeSilva v. DiLeonardi*, 181 F.3d 865, 867 (7th Cir. 1999). Based on the record, Mr. Reese has not presented evidence sufficient to establish a genuine dispute of material fact as to Mr. Reese's status as a "Forced-Out Shareholder." *Cf. Anderson*, 477 U.S. at 248; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. Accordingly, Plaintiffs are entitled to judgment as a matter of law on Count 6 of Mr. Reese's Counterclaims/Third-Party Complaint and Mr. Reese is not excepted from the post-ownership restrictive covenants of the 2017 Imperium Shareholder Agreement on such grounds.

## 2. Reasonableness of Restrictive Covenants

"Indiana courts have a lengthy tradition of recognizing and respecting the freedom to contract." *Zollman v. Geneva Leasing Assocs., Inc.*, 780 N.E.2d 387, 391 (Ind. Ct. App. 2002).

"Therefore, as a general rule, the law allows competent adults the utmost liberty in entering into contracts that, when entered into freely and voluntarily, will be enforced by the courts." *Id.* The restrictive covenants here are part of the 2017 Imperium Shareholder Agreement, a contract already found to be valid and enforceable based on the mutual assent of the parties, including Mr. Reese. So the restrictive covenants are presumptively enforceable.

Generally, "[c]ovenants not to compete are enforceable if they are reasonable." *Zollinger v. Wagner-Meinert Eng'g, LLC*, 146 N.E.3d 1060, 1066 (Ind. Ct. App. 2020). "However, the manner in which reasonableness is determined depends on the context in which the covenant was established." *Id.* at 1066–67. "[N]oncompetition covenants in employment contracts are in restraint of trade and [are] disfavored by the law." *Cent. Ind. Podiatry, P.C. v. Krueger*, 882 N.E.2d 723, 728–29 (Ind. 2008). Viewed skeptically by the law, these covenants are construed "strictly against the employer" even if deemed a reasonable restriction. *Clark's Sales & Serv., Inc. v. Smith*, 4 N.E.3d 772, 780 (Ind. Ct. App. 2014). Covenants not to compete ancillary to the sale of a business, however, are reviewed more liberally than employment-based covenants. *Dicen v. New Sesco, Inc.*, 839 N.E.2d 684, 687 (Ind. 2005). Quoted favorably by the Supreme Court of Indiana, a Massachusetts court explained the policies distinguishing employment-based non-competes from non-competes ancillary to sale of business as follows:

> In the former situation there is more likely to be equal bargaining power between the parties; the proceeds of the sale generally enable the seller to support himself temporarily without the immediate practical need to enter into competition with his former business; and a seller is usually paid a premium for agreeing not to compete with the buyer. Where the sale of the business includes good will . . . a broad noncompetition agreement may be necessary to assure that the buyer receives that which he purchased . . . . On the other hand, an ordinary employee typically has only his own labor or skills to sell and often is not in a position to bargain with his employer.

*Id.* (quoting *Alexander & Alexander, Inc. v. Danahy*, 488 N.E.2d 22, 28 (Mass. App. Ct. 1986) as having been approved in Indiana by *Fogle v. Shah*, 539 N.E.2d 500, 502 (Ind. Ct. App. 1989)).

"Despite these differences, both employment covenants and sale of a business covenants are still reviewed under a reasonableness standard." *Dicen*, 839 N.E.2d at 687. Reasonableness of such covenants is a question of law. *See Krueger*, 882 N.E.2d at 729. In the employment context, the employer bears the burden to show "that it has a legitimate interest to be protected by the agreement," and that "the agreement is reasonable in scope as to the time, activity, and geographic area restricted." *Id.* In the sale of business context, overbreadth of a non-compete agreement is determined by considering "(1) whether the non-compete provision is broader than necessary for the protection of a legitimate interest of the buyer; (2) the effect of the agreement's limitations on the seller; and (3) the effect of the covenant on the public interest, which includes consideration of the reasonableness of the limitations as to time, prohibited activities and geography." *E.T. Prods., LLC v. D.E. Miller Holdings, Inc.*, 154 F. Supp. 3d 755, 758 (N.D. Ind. 2016), *aff'd*, 872 F.3d 464 (7th Cir. 2017) (citing *Fogle*, 539 N.E.2d at 503). The primary factors in this reasonableness analysis are "the protection of the buyer's legitimate interest and the reasonableness of the time, geographical and activity restrictions." *Id.* As a result, the reasonableness analysis starts the same in both situations but is evaluated with an eye to the policy issues applicable in each case.

The non-compete provision in the 2017 Imperium Shareholder Agreement governs shareholder conduct and does not fit neatly into either the employment or sale-of-business context for which the law provides reasonableness standards. Therefore, the policies relevant to both employment and sale of business non-compete provisions are instructive in assessing how to approach the non-compete provision in the 2017 Imperium Shareholder Agreement—skeptically like in the employment context or more liberally like in the sale of business context. *Cf. Dicen*, 839 N.E.2d at 687.

Despite Mr. Reese's allegations that Mr. Lankford fired him, froze him out of the companies, denied him all rights and benefits of ownership, and seized his ownership interest by

forcing him to assert dissenter's rights, Mr. Reese retained bargaining power as a voting shareholder when executing the non-compete provisions in the various shareholder agreements between 2009 and 2017.  Mr. Reese knew he was employed by NLG or RSAm when he signed the assorted shareholder agreements and presumably foresaw a scenario where he would retain his shareholder status while no longer working for a Latitude-related company before signing.  The same agreement provided Mr. Reese with owner distributions even if he were no longer employed by the company so long as he remained a shareholder.  The fact that LSC has withheld Mr. Reese's owner distributions since May 2021 is a separate matter that does not change the fact that the non-compete was not intended to bankrupt Mr. Reese while complying with its terms.  Those distributions were also compensation for the shareholders' agreement not to compete with Latitude or any related companies.  Mr. Reese therefore retained more bargaining power as a shareholder, than the typical employee would.

The shareholder agreements also reflected the shareholders' shared vision for LSC's success and profitability as a TPA in the retirement industry.  A broad non-compete applicable to the shareholders themselves would protect that vision from the whims of any one shareholder who might seek personal gain by using their knowledge of Latitude in competition with it.  Given the policies surrounding a company and its shareholders, a more liberal reasonableness standard is appropriate in this situation.  Latitude still must establish a legitimate protectible interest.

According to LSC, the shareholders wanted to avoid the risks of competition from former shareholders.  This is a broad interest that must concern every closely held company.  However, "[t]he purpose [of] noncompetition agreements is to foster commercial ethics and to protect . . . legitimate interests by preventing unfair competition—not ordinary competition." *Custom Truck One Source, Inc. v. Norris*, No. 1:22-CV-00046-HAB-SLC, 2022 WL 594142, at *6 (N.D. Ind. Feb. 28, 2022) (citation omitted).  Even so a company's goodwill—an ordinary element of all business

competition—is a protectable interest. *Id.* (citing *Krueger*, 882 N.E.2d at 729); *see also Clark's Sales & Serv., Inc.*, 4 N.E.3d at 781. And other similarly broad and common business interests have been deemed protectable including the buyer's interest in maintaining and expanding the company's customer base, *E.T. Prods.*, 154 F. Supp. 3d at 758–59; and eliminating competition through the contracting with or solicitation of identified entities, *Dicen*, 839 N.E.2d at 688. Mr. Reese focuses on LSC's conduct after May 2021, when he was allegedly breaching the restrictive covenants, to argue there was not a legitimate protectable interest for the non-compete provision. LSC's conduct does not negate the protectable interest they have in avoiding competition from former shareholders.

Whether the restrictive covenants in the 2017 Imperium Shareholder Agreement are reasonable in time, activity, and geographic scope poses a tougher question. First, the duration of the non-compete for both the current and former shareholders is reasonable. Given the unique relationship of shareholders to companies, preventing competitive activity during ownership is completely reasonable. And a two-year post-ownership restriction does not create undue harm to a shareholder who was compensated for his shares.

Second, Mr. Reese also challenges the reasonableness of the scope of activities prohibited in in the restrictive covenants. According to Mr. Reese, the non-compete precludes employment in any part of the retirement industry, including in areas that Latitude does not compete. If that is true, and the record is not clear, that could be concerning. Almost all, if not all, of Latitude's shareholders are or were employees of Latitude or one of its related companies. Therefore, Mr. Reese's circumstance—where he built a career at a TPA company while an owner of more than one related company then found himself unemployed—would be possible for all the shareholders and would leave them unable to use their skills and knowledge to provide for themselves and their families. Indeed, this is a primary concern when considering the reasonableness of employment-based noncompete provisions. In the shareholder context, however, a broader scope of prohibited

activities is reasonable because the shareholders knew the risks of combining employment and ownership when they agreed to the restrictive covenants in the shareholder agreements. Therefore, the scope of activity prohibited by the non-compete provision in the 2017 Imperium Shareholder Agreement is not unreasonable.

With that said, Mr. Reese's argument that the non-compete provision for current shareholders in Section 5.1 is overbroad because it imposes a blanket, nationwide prohibition on any employment in the entire retirement services industry is unreasonable. Mr. Reese avers in his Affidavit, without supporting data or authority, that the Department of Labor reports the existence of 782,000 Defined Contribution Plans and Defined Benefit Plans nationally. [DE 148-71 at 4]. Mr. Pyle confirmed that Latitude is the TPA for approximately 2,500 plans. [DE 148-1 at 199]. If the DOL number is accurate, and Latitude has not objected to it, Latitude clearly retains only a small slice of the TPA industry. Inferring a national reach for Latitude's business from that small slice is a stretch. And no one has identified the location of Latitude's 2,500 clients. No one has described Latitude's marketing efforts to suggest how they may be targeting prospective clients across the country. No one has designated evidence showing a business plan with strategies to reach a national customer base. Contra *E.T. Prods.*, 154 F. Supp. 3d at 759 (finding noncompete with continental scope reasonable given the documented expansion plans of the company). With nothing more, Latitude has not established that the nationwide scope of the noncompete in Section 5.1 for current shareholders is reasonable.

Therefore, the non-compete provision in Section 5.1 of the 2017 Imperium Shareholder Agreement is not enforceable as to current shareholders, who was an LSC shareholder during the relevant period between May 2021 and December 2022. The Court need not address the reasonableness of Section 5.1's post-ownership non-compete provision because no violations have been alleged after Mr. Reese sold his shares in December 2022.

H.      **Breach of Fiduciary Duties**

1.      **Mr. Reese**

Even though the non-compete provision in the 2017 Imperium Shareholder Agreement is unenforceable as to current shareholders, Mr. Reese remained a shareholder until December 2022 and retained fiduciary duties to Latitude, its related companies, and its shareholders until then. Plaintiffs argue that if he cannot be held to the non-compete provision of the 2017 Imperium Shareholder Agreement, his fiduciary duties as a shareholder preclude the acts of competition he engaged in while he remained a shareholder.

Despite Mr. Reese's suggestion otherwise, all shareholders of closely held companies "stand in a fiduciary relationship to each other, and as such, must deal fairly, honestly, and openly with the corporation and with the fellow shareholders." *Melrose v. Capitol City Motor Lodge, Inc.*, 705 N.E.2d 985, 991 (Ind. 1998) (quoting *Barth v. Barth*, 659 N.E.2d 559, 561 (Ind. 1995)); *accord Fleming v. Int'l Pizza Supply*, 676 N.E.2d 1051, 1056 (Ind. 1997). "Shareholders of close corporations owe fiduciary duties substantially different from the duties owed by their counterparts in publicly traded corporations." *McLinden v. Coco*, 765 N.E.2d 606, 615 (Ind. Ct. App. 2002) (citing *Melrose*, 705 N.E.2d at 990. The standard of duty owed by shareholders of closely held companies is  the duty of "utmost good faith and loyalty." *Barth*, 659 N.E.2d at 561 n.6 (cleaned up). Shareholders are "prohibited from acting out of avarice, expediency or self-interest in derogation of their duty of loyalty to the other shareholders and to the corporation." *Wenzel v. Hopper & Galliher, P.C.*, 779 N.E.2d 30, 46 (Ind. Ct. App. 2002). A shareholder's "fiduciary duty also includes the duty to abstain from pre-departure 'surreptitious solicitation' of firm clients for personal gain." *Id.*

According to Plaintiffs, Mr. Reese breached his shareholder fiduciary duty of loyalty between August 2021 and December 2022 by engaging in acts of competition by working for (1) Lafayette Life Insurance Company as a Senior Pension Sales Consultant supporting life insurance agents in

sale of insurance in Defined Benefit Plans; (2) consulting for SMS Retirement, a TPA firm in direct competition with Latitude; (3) communicating with the principal of Latitude's client McGuire Ink, who then took his business to SMS; and (4) working for First Financial Bank as a Retirement Planning Consultant for small businesses helping manage their retirement investments.

Mr. Reese does not dispute any of these facts.  Instead, he argues that his work duties at Lafayette and First Financial did not compete with LSC—that he engaged in sales of insurance and investment products that LSC does not sell and that neither company provides TPA services like LSC does.  Mr. Reese also argues that while he originated five customers for SMS, only one was an LSC customer, which was referred to him by a third party and with whom he did not initiate contact.  Mr. Reese contends, without legal or factual support, that his shareholder duty of loyalty did not extend to these employment experiences because they did not amount to unfair competition.  To the extent they constituted competition at all, Mr. Reese suggests it was merely "ordinary" competition.  Presumably, he is relying upon the principle that noncompete agreements are intended to protect against unfair, rather than ordinary, competition.  *See Custom Truck One Source, Inc.*, 2022 WL 594142, at *6.  However, he develops no argument and provides no legal authority to support his contention; therefore, any such argument is waived.  *See Nelson*, 657 F.3d at 590*; Beavers*, 756 F.3d at 1059.

By introducing facts regarding the type of work he engaged in at Lafayette and  First Financial, however, Mr. Reese does bring into question whether his work with either of those businesses competed with LSC.  Thus, Mr. Reese has presented issues of fact regarding whether his work at Lafayette and First Financial breached his fiduciary duty of loyalty to LSC, a question for the factfinder.  The same is not true for his work at SMS.  Mr. Reese does not dispute that he was an LSC shareholder while he consulted for SMS, that he knew SMS was a TPA firm like LSC, and that he knew he was speaking with the principal of McGuire Ink while he was employed by SMS.  Mr.

Reese may not have initiated contact with McGuire Ink but he knew McGuire was an LSC customer and he still took the call despite his duty of loyalty to LSC. Based on these facts, a reasonable jury could not find that Mr. Reese did not violate his fiduciary duty to Latitude and its shareholders by working for SMS and talking to McGuire about TPA-related matters. Therefore, Plaintiffs are entitled to judgment as a matter of law as to Mr. Reese's breach of fiduciary duty through his SMS Retirement employment.

### 2.    Mr. Lankford

Through Count 7 of his Counterclaims/Third Party Complaint, Mr. Reese alleges that Mr. Lankford violated his fiduciary duties as the majority shareholder by assorted activity including, but not limited to, withholding owner distributions from Mr. Reese since May 2021; preventing Mr. Reese from receiving meeting notices and denying him the opportunity to attend meetings and vote; establishing a company in September 2022 without Mr. Reese's knowledge or consent then using that company in a merger designed to force Mr. Reese to sell his shares under the dissenter's rights statute; withholding information regarding negotiations with potential buyers of Latitude in 2020 and 2021; and participating in the alleged recreation of the 2017 Imperium Shareholder Agreement from the TAFT TWEAKS redline document.

The extent of Mr. Reese's allegations is not clear. [DE 87 at 44–46; DE 149 at 38–39]. However, the parties have presented documentary and testimonial evidence that include competing facts about Mr. Lankford's actions and motives vis-à-vis Mr. Reese since at least 2020. And while the record presented to the Court is voluminous, the designated evidence as to Mr. Lankford and his fiduciary duties is admittedly thin on both sides of this issue. Nevertheless, the designated evidence

establishes genuine disputes of material fact that cannot be decided here. Accordingly, neither party is entitled to judgment as a matter of law at this time.[3]

### 3. Usurpation of Corporate Opportunity

Mr. Reese now seeks summary judgment on Count VI of Plaintiffs' Second Amended Complaint, which alleges that Mr. Reese usurped a real estate business opportunity that in equity and fairness belonged to LSC or its related companies. [*See* DE 84 at 25–26]. Mr. Reese submits that he is entitled to judgment as a matter of law because neither LSC nor Highland include commercial real estate in its line of business. However, Indiana does not limit corporate opportunity claims like Mr. Reese suggests through citation to inapplicable Ohio law and irrelevant Indiana law. Under Indiana law, "a shareholder may not proceed with opportunities that are in his own interests and against the interest of the corporation or other shareholders." *Landeen v. PhoneBILLit, Inc.*, 519 F. Supp. 2d 844, 861 (S.D. Ind. 2007). Determining whether the opportunity to purchase the office building at issue belongs to Plaintiffs or Mr. Reese is a question of fact. *See id.* Plaintiffs challenge Mr. Reese's inappropriate legal conclusions about the opportunity, and Mr. Reese and Plaintiffs present competing facts regarding the opportunity. Mr. Reese disclaims liability noting that his corporation CR Group, Inc., which is not a party to this action, purchased the interest in the building after Mr. Reese informed the Plaintiffs' shareholders at a joint board meeting of the opportunity and Mr. Lankford declined. Plaintiffs, on the other hand, note that the opportunity was against Plaintiffs' interest because Plaintiffs were paying rent for office space while Mr. Reese was operating his business out the same space. These competing facts establish a genuine dispute of material fact from which the Court cannot discern who owned the real estate opportunity at issue. Therefore, neither party is entitled to judgment as a matter of law at this time.

---

[3] The Court notes that it may have already resolved issues underlying Mr. Reese's breach of fiduciary duty claim against Mr. Lankford. To the extent such decisions have been made, they will dictate the range of issues yet to be decided on this claim.

III.   CONCLUSION

For the reasons discussed above, the parties' cross motions for summary judgment are

**GRANTED IN PART** and **DENIED IN PART**.  [DE 139, 146].

Mr. Reese is entitled judgment as a matter of law on

- Plaintiffs' Count II (Breach of Restrictive Covenants in the Imperium Holdings Shareholder Agreement) [DE 84 at 17–20] to the extent that the covenants in Sections 5.1 and 5.2 of the Agreement are unreasonably broad in geographic scope.

- Mr. Reese's Count 1 (Claim for Declaratory Relief—Termination of the 2014 NLG Shareholder Agreement ) [DE 87 at 35–37].

- Mr. Reese's Count 2 (Claim for Declaratory Relief—Expiration/Termination of Invalid Non-Competition Restrictions) [DE 87 at 37–38].

- Mr. Reese's Count 3 (Claim for Declaratory Relief—2009 HMG and NLG Shareholder Agreements) [DE 87 at 38–39].

- Mr. Reese's Count 4 (Claim for Declaratory Relief—Proposed Term Sheet) [DE 87 at 39–42].

Plaintiffs are entitled to judgment as a matter of law on

- Plaintiffs' Count I (Claim for Declaratory Relief) [DE 84 at 16–17] to the extent that the 2017 Imperium Shareholder Agreement is valid and enforceable.

- Mr. Reese's Count 5 (Claim for Declaratory Relief—2017 Taft Tweak Imperium Shareholder Agreement) [DE 87 at 42–43].

- Mr. Reese's Count 6 (Claim for Declaratory Relief—"Forced Out Shareholder") [DE 87 at 43–44].

Plaintiffs' claim for Breach of Implied in Fact Shareholder Agreement (Count III) [DE 84 at

20–21] is **DISMISSED AS MOOT** because an express agreement is valid and enforceable in the

2017 Imperium Shareholder Agreement.  Plaintiffs' claim for Breach of Restrictive Covenants in the

Highland Management Shareholder Agreement (Count IV) [DE 84 at 21–24] is **DISMISSED AS**

**MOOT** because the 2009 Highland Management Shareholder Agreement is terminated.  Plaintiffs'

38

claim for Breach of the 2017 Separation Agreement (Count V) [DE 84 at 24–25] is **DISMISSED**

**AS MOOT** because the separation agreement was not valid and enforceable.

The only claims remaining to be resolved include:

- Plaintiffs' Count II (Breach of Restrictive Covenants in the Imperium Holdings Shareholder Agreement) as to Section 5.3 of the 2017 Imperium Shareholder Agreement;

- Plaintiffs' Count VI (Breach of Fiduciary Duty—Usurpation of Corporate Opportunities) [DE 84 at 25–26]

- Plaintiffs' Count VII (Breach of Fiduciary Duty—Acts in Competition) [DE 84 at 26–27] as to Mr. Reese's employment at Lafayette Life Insurance Company and First Financial Bank;

- Mr. Reese's Count 7 (Breach of Fiduciary Duty—Brad Lankford) [DE 87 at 44–46].

- Mr. Reese's Count 8 (Violations of Indiana Business Corporation Law) [DE 87 at 46].

- Mr. Reese's Count 9 (Violations of Indiana Limited Liability Company Act) [DE 87 at 46–47]

- Mr. Reese's Count 10 (Tortious Interference with Business and Contractual Relations) [DE 87 at 47].

- Mr. Reese's two Judicial Appraisal claims set forth in 3:23cv210-CCB-SJF, *Latitude Service Co., et al. v. Reese* [DE 2], as consolidated into the instant case on April 17, 2023 [DE 9].

Lastly, the stay of discovery is **LIFTED** and the deadline for completing the remaining fact and expert witness depositions is **EXTENDED** until **November 29, 2024**. [*See* DE 162]. Mr. Reese's Notice of Filing under Seal [DE 147] and his Motion to Seal [DE 172], which are both related to various summary judgment filings, will be addressed by separate order of this Court.

SO ORDERED.

September 30, 2024

_/s/ Cristal C. Brisco_
CRISTAL C. BRISCO, JUDGE
UNITED STATES DISTRICT COURT